## A. H. MITCHELL v. THE STATE.

*No. 869.    Decided December 4th, 1895.*

*Motion for Rehearing Decided June 26th, 1896.*

### 1. Continuance—New Trial—Diligence—Materiality.

Where an application for continuance is considered on a motion for new trial, it will be Held: On appeal, that the motion was properly overruled where the application shows that the witnesses resided in the county, but does not show how far they lived from the county seat, nor when the process was returned; the same having been issued on the 1st of October, and the trial was called on the 9th, and progressed several days before the evidence closed, and no effort was made to procure other process for them during that time, and it was also properly overruled where the testimony of said witnesses could not have affected the result.

### 2. Same.

It will also be Held: That an application for continuance was properly overruled where the absent witness was produced in court before the argument closed and was not called by defendant to testify, or where attachments had been issued to another county and had never been returned, and defendant made no motion requiring the officer to return said process.

### 3. Special Venire—Practice.

It is expressly provided by Art. 640, Code Crim. Proc., that no cause shall be unreasonably delayed on account of the absence of a summoned venireman, and there is no error in skipping the name of such juryman and proceeding with the empaneling of the jury, especially where reasonable time has been awarded to secure his attendance.

### 4. Same—As to Misnamed Juror.

Where a juror is misnamed in the copy of the special venire served upon the defendant, the proper practice is to stand him aside.

### 5. Same—As to Deaf Juror.

It is proper for the court to excuse a venireman, who is so deaf as not to be able to hear and understand the proceedings.

### 6. Charge on Murder in First Degree, on a Trial for Murder in the Second Degree.

Where defendant has been once before tried and found guilty of murder in the second degree, and a new trial has been awarded, it is not error for the court to charge upon the law of murder in the first degree, on another trial of the case for murder in the second degree. Such charge being frequently necessary to clearly draw the distinction between the two degrees.

### 7. Murder—Conspiracy to Beat—Killing by Co-Conspirator.

If defendant and another party agree and combine to do an unlawful act, as to beat the deceased; and in an attempt to execute such unlawful purpose, the confederate or co-conspirator kill the deceased, the defendant would be guilty of murder and nothing less, though he did not contemplate the death of deceased.

**8. Same—Manslaughter.**

On a trial for murder, where there is a total want of provocation there cannot possibly be any manslaughter.

**9. Same—Testimony of a Codefendant—Supporting Testimony.**

On a trial for murder, where the State had nolle prossed the case as to a codefendant, and placed him as a witness upon the stand; and, defendant asked him if his case had not been noll'd, and he answered in the affimative. Held: The purpose of such question being evidently to impeach him by showing that he was testifying from corrupt motives, the State had a right to ask him, if his testimony on a previous habeas corpus trial was not the same as that given on this trial.

**10. New Trial—Misconduct of Jury—Practice.**

Where, upon a motion for a new trial, based upon misconduct of the jury, the evidence as to misconduct had been adduced and argument upon the motion concluded and the motion overruled, it was not error to refuse to permit defendant to introduce additional testimony upon the question.

**11. Witness—Introdution of After Argument Has Begun.**

On a trial for murder, where the court had announced that he would hear no further testimony in the case, unless something that he did not then know of should occur; and, after the argument of the case had begun, a witness of defendant's from another county was brought into court, but, no request was made for defendant, of the court, to allow the witness to be introduced before the jury. Held: Defendant cannot be heard to complain.

**12. Bills of Exception Filed After Adjournment.**

A bill of exception filed out of term time will not be considered on appeal.

**13. New Trial—Misconduct of Jury.**

The mere discussion by the jury of other crimes attributed to the defendant, where it is not shown that such discussion influenced the jury, or a member thereof, in reaching a verdict of guilty, will not be ground for a new trial, or afford a reason for a reversal of the judgment.

**14. Same—Affidavits of Jurors.**

Affidavits of jurors, for the purpose of showing some misconduct in the jury room, should be discouraged; and where jurors have suggested matters, outside the testimony, against the defendant, and discussed such matters, they should be brought before the court and punished as such tampering with justice merits.

**15. Same—Affidavits That the Charge was not Understood.**

This court will not listen to self-stultifying affidavits of jurors to the effect that they did not understand the charge of the court.

ON MOTION FOR REHEARING.

**16. Continuance—New Trial.**

The rule is that, in an application for continuance, although due diligence may not have been used to procure the attendance of the witnesses; yet if, on the motion for new trial, it appears that their testimony is material and probably true, the new trial should be granted.

**17. Same.**

Where the testimony set out in an application for continuance is material, upon a vital issue, but it is in direct conflict with the State's theory and evidence upon the question, to warrant the overruling of the application, the rule is, that there must not only be such conflict, but the inculpatory facts for the State should be so strong and convincing as to render the truth of the facts set forth in the application improbable.

**18. Same.**

In passing upon a motion for continuance, and the motion for new trial based thereon, it is competent for the court to look to the action of defendant and his counsel after the overruling of the motion for continuance, in passing upon the

materiality and probable truth of the absent testimony; and, if their action is such as to indicate that they were trifling with the court, or that they did not believe the witness would swear as alleged, or that they did not regard the testimony as probably true, a new trial should not be granted.

### 19. Conspiracy to Beat or Whip—Liability of One Conspirator for Act of the Other.

On a trial for murder, where it appeared that defendant and another party intended to whip or beat the deceased, and the evidence was conflicting as to whether defendant or his co-conspirator inflicted the mortal wound which killed deceased. Held: If the parties combined together to whip or beat the deceased, and to do so at all hazards, and, if necessary to that end, to take his life in case he resisted or fled, one would be responsible for the act of the other; and if, in order to accomplish their common purpose, they killed him, while resisting, with a pistol or other weapon, it would be murder. If he fled to avoid being whipped, and they killed him with a pistol or other weapon, in its nature a dangerous and deadly weapon, and used in a manner immediately dangerous to the life of deceased, and death resulted, both would be guilty of murder, provided the parties, in their joint agreement, contemplated the result; and defendant, on trial, would be answerable, though it was produced in a manner he did not contemplate. If he did not intend it in kind, yet, if it was the ordinary effect of the cause, he is responsible. If he awoke into action an indiscriminate power, he is responsible. If, on the other hand, no more was contemplated than a mere misdemeanor, as an assault and battery with the hands and fists, not dangerous to life, and one of the parties, besides the intention of the other, drew a deadly weapon and shot or stabbed the deceased, then such other is not liable for murder.

### 20. Same Charge of Court—Assault and Battery.

On a trial for murder, upon the facts stated in paragraph 19, a charge of the court is correct which submits the law, as therein expounded; but such a charge is defective and erroneous if it fails to present in addition thereto, in a substantive manner, that if such was not the purpose and intent of defendant, but, defendant acted in the matter merely to inflict upon the deceased an ordinary assault and battery, and the other party, besides the intent and purpose of defendant, shot and killed deceased intentionally, the defendant could not be convicted of a greater offense than assault and battery; and the court should further instruct the jury, that, if such other conspirator struck at deceased with his pistol not intending to kill him, and he fired and accidentally killed the deceased—defendant could only be found guilty of assault and battery.

### 21. New Trial—Receiving New Evidence—Misconduct of the Jury.

Derogatory statements, with regard to the character and antecedents of a defendant on trial, made by a juror to his fellows during their retirement, and while considering of their verdict in the case, has frequently been classed as, "misconduct of the jury." Properly speaking, such matters come within the provisions of the 7th Subdiv. of Art. 817, Code Crim. Proc., which makes the receiving of other evidence by the jury, a ground for a new trial. This provision is mandatory, and where the evidence so received is material and is of a character to have prejudiced the defendant and influenced the verdict against him, this court has invariably reversed the case. See, facts stated as to derogatory statements made by jurors to their fellows. Held: To be of a most damaging and prejudicial character,

### 22. New Trial—Discovered "Bias and Prejudice of Juror."

The statute is imperative that, bias and prejudice of a juror, renders him incompetent. See, facts stated, which the court says, "If they do not indicate prejudice against this defendant, it would be difficult to find a case in which the English language would convey terms expressive of ill-will and animosity against a person.

APPEAL from the District Court of Fort Bend. Tried below before Hon. T. S. REESE.

This appeal is from a conviction for murder in the second degree, the punishment being assessed at five years' imprisonment in the penitentiary.

One Frank Williams, a negro, was killed in the city of Richmond, Fort Bend County, on the night of the 24th of September, 1895. Appellant, A. H. Mitchell, and one J. K. Neal, were separately indicted for his murder. When the case was called for trial, appellant made affidavit, under the statute, for a severance, to have Neal first tried, and a severance was granted by the court. Thereupon the District Attorney nolle prossed and dismissed the case against Neal, who turned State's evidence and testified for the State on a trial of this case.

The essential facts pertaining to the preliminary questions raised by the defendant as to his application for continuance, and the proceedings relating to the special venire and empaneling of the jury, are sufficiently illustrated in the opinions below, and need no further statement.

The essential facts pertaining to the killing will also be found fully stated in the opinion, below, of Hurt, Presiding Judge, on the motion for a rehearing.

As to the questions of the misconduct of the jury, and the receiving by them of new evidence from members of the jury—the facts are so fully stated in the opinions as to need no repetition or addition.

*J. B. Mitchell, F. M. O. Fenn, John C. Mitchell* and *J. B. Brockman*, for appellant, filed an able and elaborate brief of eighty-three pages printed matter, in which they discuss seratim thirty different assignments of error with great force of argument. Two of the most important questions are thus presented: "The court erred in overruling defendant's motion for a new trial, because the verdict of the jury was contrary to the law and the evidence."

The State relied for a conviction:

1.　Upon the theory that appellant himself intentionally shot and killed deceased; that the shot was fired on Mud street, and was fired as deceased was standing up, running, and was shot just as he was turning the corner (to the left) or;

2.　Upon the alternative of this, to-wit: That appellant and Neal were acting together with a common design, and that it was immaterial which, Neal or appellant, fired the shot that killed deceased.

This contention was sought to be supported, as to the main fact, by the testimony of the witnesses, Sophia Hunter, Annie Collins, and the accomplice witness, J. K. (Cain) Neal.

We contend that the State's proof, as made by the evidence, totally failed to establish the main fact, and that it would not be sufficient to establish even a strong suspicion of guilt; Voight v. State, 13 Tex. Crim. App., 21, and the proof of the main fact failing, that as to the collateral issues necessarily fails with it. Owens v. State, 35 Texas, 361.

We will now review the conclusions of proof which we think will show that the verdict was contrary to the law and the evidence:

1.　By a comparison of the testimony of each of the State's own witnesses with that of the others, it will be seen that the contradiction is as marked between each as if they had testified on opposite sides or to

a different transaction, and that the State utterly failed to make out a case with such degree of certainty under the law as given in the charge by the court, as would authorize a verdict of guilty against appellant; and this, independent of, and without considering the testimony adduced by appellant at all. (2) And, that when the State's proof is considered, together with the evidence adduced by appellant, the testimony of the State's witnesses is overwhelmingly impeached; and is insufficient to authorize a conviction under the law as given in charge by the court; and that the court erred in not granting appellant a new trial; and that for this error the conviction cannot stand; and the judgment must be reversed and the cause remanded to the tribunal whence it originated for another trial. Owens v. State, 35 Texas, 361; Spears v. State, 2 Tex. Crim. App., 244.

Sophia Hunter swears positively that Annie Collins was not present, and that she did not witness the shooting! Now if this be true, the testimony of Annie Collins was not true, and the State could not claim a conviction on her testimony.

Annie Collins swears positively that Sophia Hunter was not present at the time of the shooting, and did not witness it.

Then if this be true, the testimony of Sophia Hunter was not true, and the State could not claim a conviction on her testimony.

Neal swears that neither were present, and if his testimony be true, then the State is without testimony upon which it could claim a conviction, so far as Sophia Hunter and Annie Collins are concerned; and the testimony of Neal alone would not support a conviction, and if it would at all, at most would not above negligent homicide of the second degree.

The State introduced one witness, and proved positively by her that another was not present at the shooting, and did not witness it, and then introduced that other witness, and proved positively that the first witness was not present at the shooting, and did not witness it.

And then dismissed an indictment against Neal, and introduced him and proved by him that neither of the other witnesses were present, and that neither witnessed the shooting, and that the testimony of both was sworn lies, and utterly false, and contradicted both as to the manner and act of shooting. And he also contradicted both the women as to the intent, he swearing positively, that at no time was there ever any understanding to do anything more than whip or beat deceased.

This was the state of case made by the State in her evidence in chief and in rebuttal.

Now in logic of conclusion and fact, what result had been attained at this point by the State by her proof, as made by the evidence in chief of the women, Hunter and Collins, and by Neal in rebuttal of appellant's evidence; has she sustained the allegations of her indictment? We contend not!

If Annie Collins was not present, and did not witness the shooting, and Sophia Hunter swears for the State that that was the fact; and if Sophia Hunter was not present, and did not witness the shooting, and

Annie Collins swears for the State that that was the fact, and Neal swears for the State that neither were present, it is immaterial what was testified to in detail by either separately or by both together, even if their testimony was not fatally conflicting in its details and entirety as it is, since, if neither was present the testimony of neither alone or of both together as to what occurred as to the shooting is true. And if the testimony of either Sophia Hunter or Annie Collins was true, then that of Neal was not. These three witnesses were of equal credibility in the eyes of the State, she having introduced them, and the testimony of one is as much entitled to credit as that of the others—and each disproved the testimony of the others, then where does the State stand upon her proof alone, as to her allegations?

We answer: Right where she started. She has done no more, if the expression be permitted, than establish an absolute, positive negative.

She has proved no more in logical and legal conclusion, than if she had not put a witness on the stand.

We venture to say that such a state of case was never before seen in a cause where the State, with her great power, was demanding the life of one of her citizens, to whom she certainly owes as much of protection as she can afford to claim in chastisement.

The defense at this stage interposed its evidence, which directly impeaches that of the State: (1) As to the presence of Sophia Hunter or Annie Collins at the time and place of the shooting, and supports each as against the other, and contradicts both as to their presence. (2) As to the place of the shot, showing that it did not occur on Mud street, but on Third street, at least from eight to twelve feet from the intersection of the two streets, and that, therefore, if the two State's witnesses, Sophia Hunter and Annie Collins, had been on Mud street, at the place that they say they were, they could not have seen the shooting where it occurred, on account of intervening buildings. (3) That Neal had the pistol and not appellant. (4) That the pistol was in Neal's hands when the shot was fired, and that Neal, and not appellant, was in a position from which the wound of deceased could have been inflicted. (5) That deceased was instantly killed by the shot in the exact spot where he fell —twelve or fifteen feet up on Third street from Mud street, and that he did not move after the wound was inflicted. (6) That the wound could not have been given the range taken by the ball, had the deceased been shot while standing up, unless the person holding the pistol had been down on the ground, but that if in the position the defense evidence places him in—a shot fired by striking the pistol on deceased's body would take the range marked by the course of the bullet from the lower part, a little to the right of the center of the back of the neck to a little to the left of the center of the forehead, and that deceased's clothes were set on fire by the shot, and continued to burn until the fire was extinguished, shows that the pistol was against his body when discharged. (7) That from these circumstances and from the di-

rect evidence, the theory of accidental shooting, caused by Neal striking deceased with the pistol as he was stooped over, is not only reasonably, but certainly probable. (8) That if deceased had been shot, as claimed by the State; that is, when standing up running, the ball would not have gone from the lower portion of the back of the neck to the forehead. (9) That the fact of deceased's clothes being set on fire by the discharge of the pistol disproves Sophia Hunter's statement that appellant shot deceased from a point more than twenty feet from him. And also disproves Annie Collin's statement that appellant fired the shot at a point six feet distant from deceased. (10) And the parties being on the south or left hand side of the street, and going west, had appellant shot deceased just as he was turning the corner south, from either the position of over twenty feet (fixed by Sophia Hunter by the end of the gallery, a fixed object) or the position of six feet (fixed by Annie Collins, by a table near the corner and between the gallery and the corner) he could not have shot deceased in the right side of the neck while he was turning with his left side to appellant, nor in fact could he have so shot him from any position on Mud street between Mary Harper's and the corner, even if the range of the wound could have been made while he was erect. (11) That appellant did not know that Neal had a pistol. Neal having emphatically denied having one and there is nothing in the proof to show the appellant ever knew that he had one until, while in advance of appellant, he struck at deceased just before turning the corner. (12) That there was never any intention to kill or seriously harm deceased. (Also shown by State's evidence as made by Neal and supported by appellant and the circumstances in proof.) (13) That appellant had provided himself with a piece of picket, which he still had in his right hand until after the shot was fired. (14) That even if Neal fired the shot intentionally such intention was unknown to appellant and was not shared by him, and was beyond the purview of the purpose understood between appellant and Neal to give the deceased a beating or chastisment, that if an act of intention on the part of Neal it was his own independent act, done without the foreknowledge or consent of appellant. Guffee v. State, 8 Tex. Crim. App., 187; Mercersmith v. State, 8 Tex. Crim. App., 211.

Now we submit in all candor: (1) That had the State adduced the testimony of Sophia Hunter as to the main fact and rested upon it, and the opposite party had adduced that of Annie Collins; (2) Or, per contra, had the State adduced the testimony of Annie Collins, and rested upon it, and had the opposite party adduced the testimony of Sophia Hunter, they both being of equal credibility, an exact balance would in either case have been established. For if the testimony of either was true the other was not present at the shooting. But in this case both the proving and the disproving was done by the State, and then to complete the monument of conflict and contradiction already made by her evidence, the State brought forward a third witness, whose testimony she had gone to the extraordinary length of purchasing with a dismissal of an indictment against him, and by his testimony positively impeached

and disproved the testimony of her other two witnesses, and whose testimony disproves his. This was not simply conflict in the testimony of these witnesses, but was direct impeachment, and, therefore, this state of case would not fall within the rule of conflict and variance in testimony to be settled by the jury. But was fundamental, and was made and vouched for by the State. The testimony of each of the three witnesses making hypothesis of guilt on the testimony of the others impossible, if the testimony of either of the three was true, a conviction was not warranted upon this state of circumstances, upon the testimony of either, and as the antagonistic testimony of all three cannot stand together, we insist that the State was without proof upon which a sound-minded jury ought to convict, or upon which a conviction should be permitted to stand. In view of the gravity of the charge and of the character of the evidence, a new trial should have been granted. Cooper v. State, 19 Tex. Crim. App., 449; Landers v. State, 35 Texas, 359. "If of two theories (between State and defense) presented by the evidence, and submitted by the charge, the evidence tends to support that of the State, but fails to establish it with reasonable certainty, the error would be in overruling motion for new trial." Davis v. State, 10 Tex. Crim. App., 31. "When evidence is not sufficient to support a verdict of conviction, a new trial should be granted." Winn v. State, 11 Tex. Crim. App., 304, or "Where there is testimony supporting a conviction, but such testimony was contradicted in its material features, and a decided unmistakable preponderance of evidence disproves the corpus delicti, a new trial must be allowed." Spears v. State, 2 Tex. Crim. App., 244.

These propositions are each and all applicable to the case at bar, and we could not improve our contention by attempting any further elucidation than they supply. In Owens' case, where the main State's witness is directly contradicted by numerous witnesses and on material points, the court held that a new trial should have been granted on defendant's motion. In the case at bar the main evidence of the State is in the first place absolutely self-contradictory and self-contradicted in and of itself, and in the second place, when considered in the light of all the facts and circumstances in proof, is overborne by the evidence adduced by the defense traversing it.

The State's evidence is impeached beyond hope or possibility of reconciliation. While the defense's testimony in opposition to it is positive and harmonious, and, when taken together, entirely unanimous. Every syllable of the evidence worthy of belief is consistent with the truth of the theory of the defense, and there is no evidence worthy of belief to settle the guilt of appellant. Owens v. State, 35 Texas, 361.

Upon the authorities, and upon reason, we feel warranted in asserting that the verdict was contrary to law because not supported by competent evidence. Zollicoffer v. State, 16 Tex. Crim. App., 312; Mapes v. State, 14 Tex. Crim. App., 135.

We contend that the proof shows an absence of intent, and that, therefore, there could be no murder of any of the degrees charged, and upon

this branch of the case will content ourselves with citing as further authorities: Lyons v. State, 30 Tex. Crim. App., 642; Roundtree v. State, 10 Tex. Crim. App., 110; Guffee v. State, 8 Tex. Crim. App., 187; Blain v. State, 33 Tex. Crim. Rep., 236; Robbins v. State, 9 Tex. Crim. App., 666; Welsh v. State, 3 Tex. Crim. App., 413; Mercersmith v. State, 8 Tex. Crim. App., 211.

Motion for new trial and bill of exception No. 9 assigns as error the action of the trial court in overruling appellant's motion for a new trial .and in not granting appellant a new trial:

"Because, by reason of the bias and prejudice of the jurors, E. Hubbard and Wade Robinson, appellant did not have a fair and impartial trial, which bias and prejudice was unknown to appellant or his counsel, as is shown by their affidavit to that effect, marked "Exhibit E," and attached to and made a part of appellant's motion for a new trial, until after the jury had returned a verdict convicting appellant. Said biased jurors, E. Hubbard and Wade Robinson, having each qualified themselves upon voir dire as qualified and unbiased jurors to sit in the trial of his cause. The statements quoted from the affidavits of Fanning, Hagan, and Carroll, as set out in our discussion of assigned errors, twenty-fourth and twenty-fifth, supra, constitute the evidence disclosing the fact that said jurors, Hubbard and Robinson, notwithstanding their sworn testimony to the contrary on examination, were imbued with the deepest and most unrelenting bias and prejudice against appellant and his cause, which cause they had sworn to try fairly and according to the evidence adduced upon his trial under the law as given them in charge by the court. Yet, notwithstanding their sworn obligation to so try appellant's cause, the door of the jury room had hardly closed on their retirement, when, finding nearly three-fourths of their fellow-jurymen convinced by the evidence adduced on the trial, that appellant was innocent and should be acquitted of the charge on which they were trying him, these two jurors forthwith proceeded to unbosom the bias venom which they had, under cover of their solemn oaths, carried into the jury box and jury room. And not satisfied with being unrelentingly biased against appellant themselves, they at once became not only the vigorous champions of the State's cause, but unbridled and unconscionable witnesses in her behalf. And their success—in the space of about forty hours—in overcoming the conclusions of innocence held and asserted by nearly three-fourths of the entire jury, will ever remain a mystery of accomplishment, and bears unquestionable witness to the sufficiency of the evidence they supplied to attain a result the evidence adduced upon the trial had failed to induce. And the accomplishment of their designs upon the liberty of appellant, stamps them as champions of an ability worthy of emulation, but in a nobler and less fatal direction. Were these statements and the actions accompanying them evidences of bias? What is bias? "A leaning of the mind." "Propensity towards an object, not leaving the mind indifferent." "Prepossession." "Inclination." "Bent." "This definition is applic-

able to the word as used in Art. 636, Subdiv. 12, Code Crim. Proc."
Pierson v. State, 18 Tex. Crim. App., 524.   See, also, Randle v. State,
34 Tex. Crim. Rep., 43.

In the case just quoted a juror had, over objection of defendant, been
excused upon challenge for cause by the State, because upon voir dire he
stated he was friendly to the defendant, and would dislike very much to
find him guilty; the lower court was sustained, and, among other things,
said:   "The leading paramount object of our jury law is to secure im-
partial, fair-minded men as jurors to try causes, civil and criminal, and
more particularly criminal causes where not only the life and liberty of
the defendant may be involved, but also the dignity, peace and welfare
of society.

"This right to have fair and impartial jurors is the right of the State
as much as it is of the defendant.   It is as much the right of the State
to exclude from the jury a person who has bias in favor of the defend-
ant as it is for the defendant to exclude one who is prejudiced against
him."   Citing, Mason v. State, 15 Tex. Crim. App., 534.   And, "the
law is exceedingly jealous of the purity of the jury box, and always has
been.   It seeks to shut up every avenue through which corruption or
the influence of friendship, or any other improper influence, could pos-
sibly make an approach to it."   "It recognizes that impartiality is the
corner stone of the fairness, security and advantage of the trial by
jury."

In Long's case, where the impugned juror made a controverting affida-
vit denying directly that he was biased or prejudiced against the defend-
ant, etc., the court says:   "It is to be noted, however, that this juror
nowhere denies that he made this remark attributed to him, and under
circumstances mentioned by the other two jurors, and no explanation of
this fact is attempted."   10 Tex. Crim. App., 187.

In the case at bar the remarks are not denied, nor sought to be ex-
plained, and are of much more serious character than those made by the
juror in Long's case, and were made under greater aggravation as to
time, manner and persistency.

In Long's case, quoted, the court continues: "A defendant in a crimi-
nal prosecution is entitled to a fair and impartial jury, and a verdict of
conviction, however just, should be above suspicion as to its fairness
and entire compatibility with the just and pure administration of the
law."   Citing authorities.   "If the remark had not been made the juror
should have so stated; if made, but made in jest, that fact should have
been stated in connection with the other facts stated in the affidavit."
10 Tex. Crim. App., 187.   Citing, Shields v. State, 55 Ga., 697.

In Hanks' case, the court in an opinion by Chief Justice Roberts
says:   "It can hardly be said that the mind of a juror is unbiased by
prejudice who permits his feelings to be so far enlisted as to make him
the avowed and proffered champion of another's cause.   Every criminal
has a constitutional right to be tried, and punished if guilty, by impar-
tial jurors."   "While utter indifference to wrong is not the true stand-

ard of impartiality, neither is enlisted advocacy on one side, however just it may be!" Citing authorities. And continuing: "Chief Justice Tindall said in the case of Ramadge vs. Ryon, 9 Bing., 333, 'It would go to create a prejudice against jury trial if verdicts were to be the result of previous determination.' Higher ground still may be taken that the right of trial by an impartial jury is too sacred to depend upon the possibility of finding out and detecting beforehand, and raising an objection on account of the undue prejudices of all who may happen to occupy the jury box." Citing authorities. "However just the verdict in this case may be, and we see no ground to suspect it not so to be, the established prejudice of this juror gives it a taint incompatible with the just and pure administration of the law. 21 Texas, 526.

So spoke this eminent jurist in a cause where the circumstances were greatly less violative than in the case at bar, and the penalty inflicted was a fine; then how much more applicable to a case involving gravely serious infractions of a sacred right and also felony, and eternal calumny to the defendant and dishonor to the State. See, also, Sewell v. State, 15 Tex. Crim. App., 56.

In Washburn's case, 31 Tex. Crim. Rep., 352, where the impugned juror made a counter affidavit to the effect that he had no prejudice against appellant, "That he tried him on the evidence adduced; on the charge as given to the jury; and that he was not controlled in his action in trying the case by anything he heard on the outside, or personally knew of said case prior to the trial of said cause;" "but admits the statement imputed to him to Durham, and does not deny any of the statements shown to have been made by him to the other affiants." "The verdict was not obtained by means of a fair and impartial trial." "The juror Pope was so prejudiced against defendant, and his mind so fixed as to defendant's guilt, and the verdict is so tainted thereby, that we do not feel that it should be permitted to stand." Again, in this case the statements were not nearly so serious as in the case at bar. 31 Tex. Crim. Rep., 352, distinguished from Shaw v. State, 32 Tex. Crim. Rep., 155. In Shaw's case the impugned juror denied and denounced the statement as false. "A defendant is not required to presume that a juror has perjured himself when he swears on voir dire examination that he is not prejudiced, and the law does not require him to act upon such presumption." Hanks v. State, 21 Texas, 526; Armendares v. State, 10 Tex. Crim. App., 44.

In Jack's case, on the trial of a porter, the court held the remark of a juror to the effect that a porter ought to receive greater punishment for theft than another, and where it was also shown that the jury had practically agreed on the verdict rendered before the statement was made, it was held to be not error to overrule the motion for new trial. 20 Tex. Crim. App., 660. In the case at bar, the verdict had not been agreed on when the statements were made, and the indications are that a verdict of guilty would never have been rendered but for the statements and the

added exertions of the jurors, Hubbard and Robinson, in behalf of the State's cause.

"The verdict of the jury shall be above suspicion and command full faith and confidence." Wright v. State, 17 Tex. Crim. App., 152. "The granting or refusal of a new trial because, from misconduct of the jury, the defendant had not received a fair and impartial trial, being in the discretion of the court, therefore, in its determination the court will be guided by the application of the facts to the results attained." Johnson v. State, 27 Texas, 770. Applying the facts to the result in the case at bar, we have undoubted proof of the cause, bias and prejudice, to which is added championship of the State's cause, by the jurors, Hubbard and Robinson.

It will be a sad day for the cause of free trial and the pure administration of the law, when men shall be permitted—as these two have done—to cloak their prejudice under sworn denial on their examination, and, when safely behind the door of the jury room, where they fancy themselves safe from detection, proceed to poison that sacred atmosphere with the whisperings of well-nursed and insisting bias, and by violating the most sacred obligation a citizen can owe a State, practically annul the right to a fair trial by an impartial jury.

And we desire to add, that except in Ellis' case, 27 S. W. Rep., 135, in every instance in which this question has been before this court, the jury had agreed on a verdict before the prejudiced statements were made. In Ellis' case, the jury stood very much as in the case at bar, the result of the statements being the same, but requiring less persistency in Ellis' case than in the one at bar.

In our twenty-seventh assignment of error, we contended that the affidavit filed by the State did not answer the issue of prejudice charged and raised in the affidavit of appellant and his counsel, marked "Exhibit E," and attached to and made a part of appellant's motion for a new trial. Because in said affidavits of the State, the existence of bias and prejudice is nowhere expressly denied, and we, therefore, insist that even had the affidavits been in other respects sufficient, they could no more be considered upon the issue of prejudice, as raised as aforesaid by said affidavits of appellant and his counsel, than if the State's affidavits had never been filed in court, and it was error for the court to overrule appellant's motion for a new trial, and not to grant him a new trial on this ground. Graham v. State, 28 Tex. Crim. App., 582.

*Mann Trice*, Assistant Attorney-General, for the State.—(1) The absent testimony, if true, would not tend to exculpate appellant, or would it discredit, or explain the inculpatory facts, which, independent of the testimony of the two State's witnesses sought to be discredited, is sufficient to sustain a conviction for murder in the second degree. Nor does it reasonably appear that if the absent testimony had been before the jury, a verdict more favorable to appellant would have resulted. Pruitt v. State, 30 Tex. Crim. App., 156; McAdams v. State, 24 Tex.

Crim. App., 101. (2) There was no error in the court's refusal to postpone empaneling the jury until the absent veniremen could be brought in. Attachments had been issued for the absentees the day previous, and they not appearing on the following day, the court ordered the work of empaneling the jury from those of the venire present. Art. 640, Code Crim. Proc.; Hudson v. State, 28 Tex. Crim. App., 323. (3) No error is shown by third, fifth and sixth bills of exception. It does not appear from the bills that appellant asked for attachments for the alleged absentees (the court ordered attachments). Nor is it shown that they had not been summoned. The case is not, therefore, analagous to Osborn v. State, 23 Tex. Crim. App., 431. In that case the name that appeared on appellant's list had not actually been served, and of this the trial court was advised. Mere discrepencies between the names summoned and those that appear upon the copy is not ground for quashal of the writ. Bowen v. State, 3 Tex. Crim. App., 617. There is no pretense that the variance in names in this case was other than a mere discrepancy. However, the court permitted the name of L. A. Priester to be called, and upon his failure to answer ordered talesman. It does not appear that appellant was misled or injured by this, or that appellant exhausted his peremptory challenges. Bowen v. State, supra. (4) Misconduct of jury: "The probable effect upon the verdict is the criterion that should govern the court in passing upon the misconduct of the jury." Kelly v. State, 28 Tex. Crim. App., 120. Misconduct not ground for a new trial unless it be shown to be such as affected the fairness and impartiality of the trial. 20 Tex. Crim. App., 656. Presumption is in favor of the impartiality of the trial and the verdict, and "this presumption can only be overcome by clear and satisfactory proof." Vol. 2, Thompson on Trials, 1980; People v. Williams, 24 Cal., 31; Mathis v. State, 18 Ga., 343; State v. Duestor, 1 Bay (S. C.), 377; M'Causland v. M'Causland, 1 Yates (Pa.), 380.

In view of the foregoing rules of law, the record in this case fails to show such misconduct of the jury as would require or justify a reversal. The affidavits of the impeaching jurors, Pete Fanning, Hogan and Carrol, fails to state or show that they were influenced by the alleged statements made to them by other jurors in the jury room. Fanning said, "We are trying Mitchell in this case, and not for what he may have done heretofore." Hogan and Carrol do not even intimate that they were influenced, or that they would have rendered a different verdict if the statements had not been made. The other nine members of the jury swear positively that they were not influenced by anything save the evidence adduced on the trial. Then, in what way does the proof show that the verdict was influenced by misconduct? Moreover, the statements alleged to have been made by the foreman of the jury related to the brother of appellant. Be that as it may, there was a clear-cut issue of facts presented to the trial court as to whether the verdict was influenced by improper conduct of the jury in hearing statements and evidence in the jury room not adduced on the

trial.    He decided that issue in favor of the verdict, and in such case the rule is "an appellate court will not interfere with the decision of the trial court when the affidavits are conflicting."    2 Thompson on Trials, 1981; Dill v. Lawrence, 10 N. E. Rep., 109.

After the original opinion below affirming the judgment, Duncan & Jones, for appellant, filed the following motion for rehearing.

To the Honorable, the Judges of said Court:   Now comes the appellant, A. H. Mitchell, by counsel, and moves the court to grant a rehearing herein—a reconsideration of the opinion and judgment in this case, delivered and rendered on the 4th day of December, A. D. 1895, and for a reversal of said judgment, and a remanding of said case for a new trial in the court below in accordance with the established rules of law; upon the following grounds, to-wit:  Because this Honorable Court erred in its said judgment and opinion in the following particulars, namely:

1.   In holding that the application for a continuance, made by the appellant in the court below, was correctly overruled; that diligence to secure the testimony of the witnesses for whose absence a continuance was asked had not been shown; that the absent evidence was not, under the circumstances, material, and that the motion for new trial was correctly overruled upon the point of the materiality and probable truth of such evidence.

2.   In holding that the court below did not err in its ruling in the matter of venireman, T. W. Ayler, as is more fully shown by bill of exception No. 3.    The attention of the court is called, in this connection, to a copy of the original bill of exceptions herewith filed, showing correction of some clerical errors in copying the bill into the transcript. The facts as thus shown are, that T. W. Ayler was upon the sheriff's list and the list furnished the defendant, and that when this name was reached, in empaneling the jury, it was responded to by T. W. Oyler. Defendant objected to Oyler as a juror for these reasons.

3.   In holding that the court below committed no error in the matter of venireman, L. A. Priester.

4.   In holding that there was no error in permitting the accomplice witness, Neal, to state that his testimony was the same as had previously been given on another trial.

5.   In holding that there was no feature or phase of the case calling for the charge upon negligent homicide in the second degree.

6.   In stating, in the opinion, that the court had charged the jury that if the killing was accidental, either by Neal or the appellant, they would acquit; whereas, in fact, the court charged the jury that if the killing was accidental, by Neal, they might acquit, and failed to charge upon the theory of accidental killing by Mitchell, though, from the evidence, the defendant was entitled to have the jury consider such theory.

7.   In holding, in effect, that there was no error in the court below

in failing to submit to the jury the question of accidental killing by appellant, Mitchell.

8.   In holding that there was no error in the court below failing to charge the law of negligent homicide of the second degree.

9.   In holding that there was no error in overruling the motion for new trial by the court below, as made upon the ground, that the jury, after having retired to deliberate upon the case, received other testimony.

10.   In holding that such motion for new trial was correctly overruled, as made upon the ground, of bias against the defendant in those members of the jury who gave such testimony after the jury had retired to deliberate; and as made upon the ground, of misconduct of such jurors in furnishing such testimony after the jury had retired to deliberate, and as made upon the further ground that the giving and the receiving of such testimony entitled the defendant to a new trial and upon the ground that the discussion thereof by, and in the presence of, the jury, was such misconduct as conclusively shows that the defendant did not receive a fair and impartial trial.

11.   In holding that the court below correctly overruled appellant's motion for a new trial, as made upon the ground that the verdict of the jury was contrary to the law and the evidence.

Appellant submits that a rehearing should be granted; and, in view of the fact that the present term of the court is about now to close, and of his earnest desire that his counsel shall have time to examine the authorities and prepare a full argument of this motion, he prays the court to transfer this motion to Dallas for hearing at the next term, at such date for submission as may be agreed upon between the Honorable Assistant Attorney-General and his counsel; expressing the hope that the case and questions involved may be deemed of such character as to authorize the court to request argument upon this motion.

*John M. Duncan*, for appellant, on the motion for rehearing:—After a careful examination of the matter and a close reading of the pertinent authorities, I have concluded that there can be no doubt of an erroneous adjudication of the following questions:   (1) As to overruling the motion for a continuance, and the refusal to grant the motion for a new trial as made on the ground of the materiality and probable truth of the testimony for which the continuance was asked.   (2) As to the failure of the court below to charge the law of negligent homicide in the second degree.   (3) As to the extent of Mitchell's responsibility for the act of Neal upon the theory that Neal actually fired the shot.   (4) As to the testimony which was given to the jury, after they had retired to consider their verdict.   (5) As to the bias and prejudice of certain jurors who gave such testimony.   (6) As to Neal's corroboration of himself, and (7) As to the failure of the court to charge the jury upon the theory of accidental killing by Mitchell.

And:   (1)   As to the application for continuance, and the overruling

of the motion for new trial, as based on the ground of materiality and probable truth of testimony, he filed an able argument, citing the following authorities: Jetton v. State, 17 Tex. Crim. App., 311; Hollis v. State, 9 Tex. Crim. App., 645; Strickland v. State, 13 Tex. Crim. App., 364; Pinckord v. State, 13 Tex. Crim. App., 468; Holder v. State, 13 Tex. Crim. App., 605; Adams v. State, 19 Tex. Crim. App., 1; Miller v. State, 18 Tex. Crim. App, 245.

2. As to the failure to charge the law of negligent homicide in the second degree, he cited, Penal Code, Art. 591; Scott v. State, 10 Tex. Crim. App., 113; Rutherford v. State, 15 Tex. Crim. App., 236; Heath v. State, 7 Tex. Crim. App., 466; Robbins v. State, 9 Tex. Crim. App., 666; McConnell v. State, 22 Tex. Crim. App., 354; Whaley v. State, 9 Tex. Crim. App., 305; Elliston v. State, 10 Tex. Crim. App., 361.

3. As to the extent of Mitchell's responsibility for the acts of Neal, upon the theory, that Neal actually fired the shot, he cited, Blaine v. State, 30 Tex. Crim. App., 703; Stevenson v. State, 17 Tex. Crim. App., 618; Woodworth v. State, 20 Tex. Crim. App., 380; Mercersmith v. State, 8 Tex. Crim. App., 212; Welsh v. State, 3 Tex. Crim. App., 420.

4. As to the testimony given to the jury, after they had retired to consider of their verdict. What evidence was given in the jury room by Hubbard and Robinson, in regard to which there is no question or contest? (1) That Hubbard stated to the jury that defendant shot a man in the back, and killed him, because he was a witness against defendant about some cattle. (2) That he (Hubbard) had seen defendant holding out cards when playing. (3) That defendant's brother, Jim Mitchell, was in a shooting scrape at Houston, the juror giving all the details. (4) Robinson stated to the jury that he knew the Mitchell boys and Neal, and that they were not liable to have any accidental shooting. (5) That both Hubbard and Robinson said to Fanning that they told him these things because he was a stranger. (6) That all this was openly talked in the jury room. (7) That on the first vote, before the above evidence was given to the jury, they stood eight for acquittal and four for conviction. (8) That the jurors, Hogan and Carroll, were satisfied that the eight who were for acquittal were influenced in finding a verdict of conviction by statements made by Hubbard and Robinson. It is true that this latter statement is met in a general way, but when the affidavits are analyzed, they will be found not to make a direct issue of this. Still, in our view, it is not material whether it has been shown that they were so influenced, nor material that they, or a part of them, have denied it.

Did the above statements of Hubbard and Robinson constitute testimony? We should say so. It constitutes testimony both as to facts and as to character, that character which could not have been put in issue by the State before the jury in order to secure a conviction, was put in issue by these two jurors before the jury and without the knowledge of the defendant, with no opportunity to meet it, or to cross-examine the wit-

nesses.    Certainly the evidence that defendant had shot a man in the
back, because he was a witness against him about some cattle, was con-
clusive proof as to the character of the man, and was intended to show
the jury the probability that this sort of a man was guilty of the offense
with which he was there charged.    The inference intended to be drawn
from all this was, that the defendant was a murderer and a thief, un-
worthy of belief, and proper material for punishment, without regard to
his guilt or innocence in the particular case being tried.    The evidence
they gave to the jury as to Jim Mitchell, obviously was intended to have,
and did have, the same effect—to discredit Jim Mitchell before the jury,
for he had·been a witness in the case on trial, and to give a general bad
character to him and his brother.    Robinson stated his acquaintance
with the character of these men, and gave it to the jury as his opinion,
from that acquaintance, that they "were not liable to have any acci-
dental shooting."    Thus, in the privacy of the jury room, introducing
evidence to overthrow the theory of accidental shooting, whether by
Neal or by Mitchell.    But why argue further that this was testimony,
and such a giving of testimony as is denounced by the statute?    That it
was calculated to, and did influence the verdict, there is no sort of doubt.
But it is not necessary for the defendant to show this to be a fact in
order to entitle him to a new trial.

Art. 777, Code Crim. Proc., of the present Code, stating the grounds
upon which new trials must be granted, is exactly similar in its provis-
ions to the article on the same subject in the old Code, and we now call
the court's attention to this article.    It provides that new trials in cases
of felony shall be granted for the following causes, and for no other.
Then follows nine subdivisions defining the instances in which a new
trial must or may be granted.    Some of these provisions, indeed most
of them, are imperative; and if the defendant, in his motion, brings
himself within the terms of such provisions, the court is bound to grant
the motion, without regard to any such contingency as an injury done
to the defendant.

It is not until we reach the seventh subdivision and its second dis-
junctive clause, that we find a contingency or condition provided for in
which, under certain circumstances, the court is authorized to overrule
the motion.    But there is no contingency attached to the first provision
of the seventh subdivision of said article, which is as follows:

"Where the jury, after having retired to deliberate upon a case, have
received other testimony."    The whole article, as applied to this provis-
ion, stands as though it read:    "New trials in cases of felony shall be
granted where the jury, after having retired to deliberate upon a case,
have received other testimony."

There is no condition nor contingency attached to it.    The right pre-
served by this provision is as fundamental and as valuable as any right
preserved and guaranteed by any of the preceding subdivisions; and, as
in the case of the preceding ones, the irrefutable presumption that an in-
jury has been inflicted, arises from the deprivation of the right; and the

courts have no more authority for engrafting upon this independent provision the condition that an injury must be shown than they have in the cases of the preceding subdivisions. Can this court lay its finger upon a right more expressly guaranteed, dearer and more valuable to the citizen, than that which is preserved by this provision? If not, why should it be less hallowed than others of like or less importance?

Following the last-mentioned provision, it is provided that, where a juror has conversed with any person in regard to the case, or has become so intoxicated as to render it probable his verdict was influenced thereby, a new trial may be granted. We say "may be," because that is the effect of the provision; it is not imperative. If the verdict was not influenced by the liquor, or if it was mere drinking of liquor, it is a matter in the discretion of the court whether a new trial be granted. Then follows Subdiv. No. 8, which is quite apart from and independent of Subdiv. 7, in that it provides an entirely different ground for a new trial, as follows:

"Where, from the misconduct of the jury, the court is of opinion that the defendant has not received a fair and impartial trial, and it shall be competent to prove such misconduct," etc.

Now, while the receiving and considering of evidence by a jury after retiring might, in common language, be termed "misconduct," and while such misconduct might bring the thing done within the provisions of Subdiv. 8, so as to rest it within the discretion of the court, as to whether a new trial should be granted, upon the facts viewed as misconduct merely, still it would not remove the case from the operation of the first clause of Subdiv. 7, and the granting of a new trial would be imperative if the facts showed the giving of testimony to the jury after their having retired to deliberate. In other words, such action of a jury or juror, in giving and receiving such testimony, might be well termed "misconduct," but there is no other character of misconduct which could arise under Subdiv. 8 to which the first clause of Subdiv. 7 could be applied. Evidently, then, Subdiv. 8 was intended to reach other instances of misconduct not provided for by special definition; and it was intended to leave the granting of the motion in such instances to the discretion of the court. We have noticed all through the decisions on this question, that the courts have almost invariably in their treatment of questions arising under these provisions, confounded the two subdivisions and have not made the distinctions here insisted on. This court may say that this is granting a great deal, namely, that we have no precedent for the distinction we make. Our reply is, that the distinction, as far as our research goes, has never been brought to the attention of the court, and that it is so clear and reasonable as to not need the prop of a precedent. Mind you, we do not for a moment insist that to maintain this distinction is necessary to sustain our contention that the motion for a new trial should have been granted on this ground, for we believe that the decisions of this court, without regard to such distinction, clearly require the granting of this new trial upon this ground.

Citing, Wharton v. State, 45 Texas, 2; Jack v. State, 20 Tex. Crim. App., 656; McKissick v. State, 26 Tex. Crim. App., 673; Anschicks v. State, 6 Tex. Crim. App., 524; Hargrove v. State, 33 Tex. Crim. Rep., 431; Ellis v. State, 27 S. W. Rep., 135; Hogan v. State, 28 S. W. Rep., 949.

5. As to the bias and prejudice of the jurors, Hubbard and Robinson. The right to a trial by an impartial jury is guaranteed to the citizen in the bill of rights in the same section in which it is provided that he shall be confronted with the witnesses against him, and this guaranty is assured to him, as far as rank perjury can be provided against, by the provision of the Code Crim. Proc. Art. 673, which declares as "incapable or unfit to serve on the jury" one who has a bias or prejudice in favor of or against the defendant. It is there provided that the juror upon his oath, may be questioned as to such bias, and if it be disclosed, he is incompetent. Were Hubbard and Robinson biased against the defendant? Were they biased when they were taken on the jury? Can there be any doubt of it? This is Webster's definition of bias:

"A leaning of the mind; propensity toward an object; not leaving the mind indifferent; inclination; prepossession; bent."

Did these men have a leaning of the mind against defendant? Were their minds indifferent towards him? Did they have an inclination or prepossession against him?

The very fact also that they had passed a voir dire examination without disqualifying themselves was sufficient to show that their prejudice was not merely passive, but active and eager for its discharge upon defendant. Let us see how Mr. Webster defines prejudice:

"An opinion or decision of mind formed without due examination; pre-judgment; a bias or leaning towards one side or the other of a question from other considerations than those belonging to it; an unreasonable prediliction or pre-possession for or against anything; especially an opinion or leaning adverse to anything, formed without proper grounds or before suitable knowledge."

Thus, it is seen that these definitions of bias and prejudice, exactly describe the state of mind of Hubbard and Robinson towards the defendant. This bias and prejudice existed when they went on the jury. According to their own statements, they knew these facts before they were empaneled. Were these proper men to try the defendant? Was the defendant tried by a fair and impartial jury? It is impossible to affirm that he was. It is impossible not to affirm that he was not. Long v. State, 10 Tex. Crim. App., 186; Hanks v. State, 21 Texas, 526; Henrie v. State, 41 Texas, 573; Washburn v. State, 31 Tex. Crim. Rep., 352; Pierson v. State, 18 Tex. Crim. App., 557; Graham v. State, 28 Tex. Crim. App., 582; Sewell v. State, 15 Tex. Crim.App., 56.

6. As to Neal's corroboration of himself. [The proposition to show that he is not corroborated, is presented in an able argument, which on account of its length, the Reporter regrets his inability to reproduce.]

*F. M. O. Fenn, J. B. Brockman* and *William Sorley*, also for the motion for rehearing, filed an able brief in the case, and, upon the question of Mitchell's responsibility, upon the theory that Neal did the shooting, they cited, 1 Chitty's Crim. Law, §§ 263, 264; 1 Bishop's Crim Law, § 265; Rex v. Callison, 4 Car. & P., 392; Reg. v. Powell, 9 Car. & P., 437; 3 Chitty's Crim. Law., 729; Foster, 258; 1 Hale, 442-445, 446; Whar. Crim. Law, § 120; 1 Bishop's Crim. Law, 258, 266, 269; State v. Absence, 4 Port., 397; Frank v. State, 27 Ala., 37; Thompson v. State, 25 Ala., 31; 4 Black., § 37; 1 Russ., 26.

*Mann Trice,* Assistant Attorney-General, for the State. In reply to motion and briefs for rehearing—(1) The granting of a continuance is not a matter of right, as it was prior to the enactment of Subdiv. 6, of Art. 560, Code Crim. Proc. This subdivision confers upon the court discretionary power to grant or refuse a continuance, and unless clearly abused this court will not interfere. Howard v. State, 8 Tex. Crim. App., 53; Dunlap v. State, 9 Tex. Crim. App., 179; Sec. 2169, Will-Crim. Stat.

Grant, then, for the sake of argument, that this court erred in holding the diligence insufficient, can it be said that this would entitle appellant to a rehearing? This must be answered in the negative, unless it appears from the record that the testimony sought was material, and probably true; and in addition to this it should reasonably appear that the result of the trial would have been different had the testimony been before the jury. Pruitt v. State, 30 Tex. Crim. App., 156; Art. 560, Code Crim. Proc.

I therefore adhere to the proposition made on the original argument made in this case, viz: Concede, for the sake of argument, that the two negro women were in another county at the time of this homicide, still there is ample testimony in the record upon which to predicate a judgment of murder in the second degree. It appears from the record that Mitchell was an officious intermeddler between the deceased and his concubine, with whom deceased was quarreling. Appellant interfered in this quarrel, and used violent and abusive language towards the deceased, then went in quest of his pistol for the avowed purpose of giving the deceased "a damned good beating." After Kane Neal joined him, they together sought the deceased, and found him concealed in a house. They routed him, and forced him to leap out of a window and flee for his life. Mitchell pursued him, striking and beating him with the picket. This was shown independent of the two negro women, whose testimony the appellant sought to impeach by the absent witnesses.

2. Negligent homicide.—The facts in evidence in this case did not raise the issue of negligent homicide. Art. 584, Code Crim. Proc., clearly eliminates this issue from the case: "To bring the offense within the definition of homicide by negligence, either of the first or second degree, there must be no apparent intention to kill." See, also,

Akin v. State, 10 Tex. Crim. App., 610; Robbins v. State, 9 Tex. Crim. App., 666.

The record in this case clearly shows an apparent intention to kill, in stead of it appearing that there was no intention to kill. Appellant and his companion, with a pistol and a picket, made a deadly assault upon the deceased—that death was calculated to result from the assault made cannot be well questioned. Therefore, the court properly refused to instruct upon negligent homicide in the second degree. I will go further and say, that no charge upon manslaughter would have been justifiable under the facts in evidence in this case. It is obvious that the difficulty was provoked for the purpose of "doing serious bodily injury to deceased." Art. 603, of the Code, under such circumstances, clearly eliminates the issue of manslaughter.

3. If it be conceded (which I do not) that Kane Neal fired the fatal shot, still, under the undisputed facts, appellant would be guilty of murder in the second degree; and this conclusion is inevitable regardless of what the appellant may have said when he started out to look for the deceased. The intention of the parties and their guilt or innocence is to be gathered from their acts, as well as from their words; and although they may have said they only intended to assault the deceased, yet if their acts showed a different purpose, they would be judged by their acts rather than by their words. Unquestionably, the assault by them with the picket and pistol, clearly evinced a purpose to go beyond a mere simple assault and battery. According to appellant's testimony, Neal pursued deceased with the drawn pistol, and assaulted him with it, when it was claimed that the pistol was accidently discharged, and caused the death of the deceased. Appellant was in the same chase, armed with a large picket, gathered from a fence, and was himself endeavoring to inflict serious injury upon the deceased. Can any sane man say, that death would probably not be the result of such an assault. Unquestionably, no. If so, then this brings appellant squarely within the rule announced in Blaine's case, 30 Tex. Crim. App., 702.

4. Misconduct of the jury.—Before a new trial will be granted for having received other testimony after the retirement of the jury, the testimony so received must be of such a character as would probably influence the verdict. 28 Tex. Crim. App., 416. The misconduct of the jury will not be ground for new trial, unless it is shown to be such as affected the fairness and impartiality of the trial. Sec. 2545, Willson's Crim. Stat.

The question now presents itself—Was the verdict of the jury influenced by the alleged statement? If so, whose province was it to determine this question? This, under the law, is the peculiar province of the trial judge; and, in such cases the Appellate Court will not interfere with the decision, especially when the evidence is conflicting. 2 Thompson on Trial, Sec. 2616, p. 1981. In this case the evidence was conflicting. Nine of the jurors swearing positively, that their verdict was not influenced by any statements made. Of course the three im-

peaching and purifying jurors, were not influnced, as it clearly appears from their evidence, that they would not deign to notice any statement made except that coming from the witness stand.

5. It is only by virtue of the statute that impeaching evidence of jurors, seeking to affect their verdict can be heard in this State. Upon grounds of public policy the courts have almost universally and for time immemorial agreed upon the rule that no affidavit, deposition or other sworn statement of a juror will be received to impeach the verdict. See, Thompson on Trials, Sec. 2816, and authorities there cited. It is obvious, therefore, that our statute. is in derogation of the common law, and should therefore be strictly construed, and its scope not enlarged by construction. The danger of enlarging this statute by liberal construction is apparent. If you go beyond the strict letter of the statute, encouraging impeaching evidence of this kind, the vocation of the jury-fixer, bribe-offerer and bribe-taker, will be plied to the jury after their discharge· rather than before their empaneling. In order to avert such danger and discourage this practice, great care and caution should be observed. I therefore submit that the jurors being qualified on oath, and that afterwards when their motives and verdict is impeached, they can reiterate that their verdict was not influenced by anything that transpired after their retirement, should be upheld. This question was submitted to the trial court, who decided in favor of the fairness and impartiality of the verdict; and this court should not disturb that finding, unless it is clear that he abused his discretion.

HURT, PRESIDING JUDGE.—Appellant was tried in the court below on the charge of murder, was convicted of murder in the second degree, and given five years in the penitentiary. From said judgment and sentence he prosecutes this appeal. Appellant made a motion for a continuance, which was overruled by the court. He presented the same question in a motion for a new trial, which was also overruled, and he assigns the action of the court in this regard as error. Appellant desired to continue the case on account of the absence of the following witnesses, alleged to reside in Fort Bend County, to-wit: W. McNeal, George Harvey, Henry King and Johnnie Williams, and for the witnesses, Steve Bland, Mayfield Williams and B. Chancery, alleged to reside in Harris County. With respect to the witnesses in Fort Bend County, we are of the opinion that the appellant failed to show proper diligence. The indictment was found in this case on the 27th day of September, 1895, and on the 1st day of October appellant applied for and had subpœnas issued to Fort Bend County for said witnesses. The case was called for trial on the 9th day of October. The application recites that the subpœna was now in court. It does not show when it was returned, nor how far said witnesses lived from the county seat. If the process had been returned several days before the case was called, and the witnesses were absent, it was the duty of appellant to have obtained attachments for said witnesses; and when the case was called for trial, it was three

or four days before the evidence closed in the case, and yet no effort is shown in the application to obtain the attendance of said witnesses. We reasonably presume that, if they lived in the county, their attendance could have been secured by any reasonable effort on the part of appellant before the close of the testimony. By the absent witnesses, McNeal, King and Johnnie Williams, the appellant alleges that he expected to prove that they were in the town of Richmond on the night of the homicide, and at the time it occurred, and saw two of the principal State's witnesses, to-wit: Sophia Hunter and Annie Collins, some of them seeing one and some the other, and that at the time the shot was fired said witnesses were in such position and locality that they could not have seen the homicide or any part of it, as they testified to on the trial of the case. Now, conceding that proper diligence was used to procure the attendance of said witnesses in this case, still if the testimony of the two State's witnesses, whose evidence it is proposed to impeach, is eliminated from this case, which is the object of the absent testimony, yet we fail to see how it would affect the result reached on the trial. Looking to the appellant's testimony, the most that can be said is that Kane Neal killed the deceased, and not Mitchell, the appellant; but the testimony of one or more of said witnesses for the appellant shows that, at the very time of the homicide, in pursuance of an agreement between the parties, the appellant, in company with Neal, was pursuing the deceased, and was present at the very time he was killed, and was participating in the homicide, and the testimony of a number of other witnesses on the part of appellant tends circumstantially to establish the same fact. The same observations will hold good as to the witnesses for whom attachments were issued to Harris County, namely: Steve Bland and Mayfield Williams; and, moreover, we would remark, as to the Harris County witnesses, that one of them, to-wit: Chancery, by whom, according to the application of appellant, more testimony of a more material character for appellant could be elicited than by either of the other witnesses—that before the beginning of the argument in the case, said witness, Chancery, was produced and brought into court, and no effort was made on the part of the appellant to avail himself of his testimony. If the appellant failed to avail himself of the best witness he had, according to his affidavit, when it was within his power to produce them before the jury, we cannot reasonably presume that he would have used the other witnesses had they been present. We would further observe, that the application shows that the writs of attachment for said witnesses to Harris County were not returned. It was his privilege to have caused other writs to issue, and to have made a motion requiring the Harris County officer to make return of said writs, yet the appellant failed to do either, and so was lacking in diligence.

In regard to the special venireman, Packer, the court used proper diligence to obtain his presence, and a reasonable time was awarded to secure his attendance, which was unsuccessful, and there was no error in skipping his name and proceeding with the impaneling of the jury. The

same observations may be remarked about the venireman, Stratman. Article 640 of the Code of Criminal Procedure provides, that no cause shall be unreasonably delayed on account of the absence of those who have been summoned. With reference to the venireman, T. W. Ayler, it appears that the list furnished the appellant contained the name of T. W. Oyler, which bore the number 27. When this number was reached, "T. W. Ayler" was called, instead of "T. W. Oyler." Appellant objected to examining and passing upon Ayler, contending that Oyler should be called. It does not appear that Oyler had been drawn or served, the rule being that where a juror is misnamed in the copy of the special venire served upon the defendant, it is the proper practice to stand him aside. Thompson v. State, 19 Tex. Crim. App., 594; Swofford v. State, 3 Tex. Crim. App., 77; Bowen v. State, Id, 618; Hudson v. State, 28 Tex. Crim. App., 323; Hubbard v. State, 72 Ala., 164. The 100th name on the special venire, as drawn, was one Priester. In the copy served upon the defendant, this name was Briester. Appellant made the same objections, when this name was reached, as he did with reference to Ayler. There is nothing in the bill of exceptions to show that Briester had been drawn on the special venire, or that such a man existed. The court overruled the objection, to which appellant excepted. We make the same reply, supported by the same authorities, with reference to this venireman, that we have to the venireman, Ayler. The court excused the venireman, H. R. Chapman, on the ground that he was hard of hearing, and not able to understand the proceedings in court. The appellant objected to this, and reserved his bill of exceptions. In this action of the court there was no error. There was no error in the court charging the law of murder of the first degree, the appellant having been convicted of murder in the second degree. This charge is frequently necessary in order to clearly draw the distinction between the two degrees. Nor was there any testimony in this case calling for a charge upon negligent homicide. If Neal and this appellant agreed and combined to do an unlawful act, such as to beat the deceased, and the deceased was killed by Neal in the attempt to execute the common purpose, the appellant would be guilty of murder, and nothing less, though he had not contemplated the death of deceased. The charge of the court is more liberal on this point than the appellant was entitled to. If the appellant killed the deceased, which is supported by very strong testimony, he was evidently guilty of murder. If Neal, in pursuance of the combination to inflict a battery upon deceased, appellant, being a party to the combination, is guilty of murder. There could possibly be no manslaughter, because of the want of a provocation. If the killing was accidental, either by Neal or the appellant, the court instructed the jury to acquit, and this was all that the appellant could have asked. In this connection, we would observe that, when the testimony of absent witnesses is looked to and weighed along with the legal propositions above stated, it would serve the appellant no legitimate purpose; for, whether Neal or the appellant shot the deceased,

when viewed in the light of the testimony, which is not contradicted, they combined to commit a battery, this appellant would be guilty of murder.    To restate, let us concede that Neal killed the deceased, and not this appellant.    Let us concede that those women were not present. Yet it is an absolute fact that Neal or the appellant—one—killed the de- ceased in the execution of an unlawful design, namely, to commit a battery upon him.    This being the case, he would be guilty of murder, though Neal did the shooting. · Brennan v. People, 15 Ill., 511; 2 Hawk., P. C., Chap. 29; 1 Hale, P. C., Chap. 34; 1 Russ., Crimes, 24; Chitty's Crim. Law, § 264.    We have examined the charge of the court very critically, and, when taken as a whole, it is the law of this case, and every phase of the case.    It is more favorable to the appellant than he was entitled to, and the special charges asked by appellant were not called for.    The court's charge holds the appellant guilty, if he contem- plated the infliction of serious bodily injury or death, and that he would be guilty if he and Neal intended a mere beating.    This is placed beyond question when we look to the fact that, while in pursuit of the deceased, one had a picket, and the other a pistol.

Neal was introduced as a witness for the State.    There had been an application and trial for bail.    Neal testified on that trial for himself. Before introducing him as a witness in this case a nolle prosequi was entered.    Upon cross-examination appellant's counsel asked him if· his case had not been nol pros'd.    He answered in the affirmative.    Counsel for the State asked him if his testimony on the habeas corpus trial was not the same as that given on this trial.    He answered that it was. This question and answer were over the objection of appellant, the ob- jection being that you could not thus support a witness.    The law is with the action of the court below.    Evidently, when the counsel for the appellant proved that the prosecution had been nol pros'd as to Neal, the purpose was to impeach him by showing that that was the cause of his testifying as he did, and that his testimony was therefore corrupt, and perhaps induced by a bargain between him and the State.    Under this state of case the party introducing him could show that he made the same statement before his case was dismissed.    This is not an open question.    Counsel for appellant presented his motion for a new trial, and argued the same for two and one-half hours.    State's counsel replied briefly.    Affidavits had been taken pro and con in regard to some state- ments made by the jurors on their retirement with reference to the ap- pellant, having killed a man, and his brother's having killed a man, etc. The testimony in regard to the misconduct of jury in this respect had closed before the argument on the motion had begun.    The court took the motion under advisement, and on the next day overruled the same. Appellant's counsel contends that he should have been permitted to reply to the District Attorney.    He was asked on the previous day if he desired to reply, and he said that he did not.    Counsel also contends that he should have been permitted to introduce additional testimony in regard to the misconduct of the jury, as above indicated.    No additional testi-

mony was offered. In order to avail himself of the right to introduce additional testimony pending the motion, he should have offered the affidavits of witnesses, and if rejected, the bill of exceptions should state what he proposed to prove. This was not done. It is true he states in his bill that he proposed to prove "statements contained in the State's affidavit seeking to controvert the defendant's were not in fact proved," but he does not state what facts he proposed to prove in order to negative the State's affidavit. Conclusions will not do. He must set out the facts, so that the court below and this court could determine whether they were calculated to have that effect or not. But, conceding that he could have shown this, both parties had concluded their evidence in regard to the misconduct of the jury before the argument on the motion began, and there was no abuse of the court's discretion in refusing to go further into this matter. The appellant complains that he was deprived of the witness, Chancery, who was brought from Harris County by attachment after the evidence in the case had closed; and the bill in this connection shows tha' the court announced, before the witness, Chancery, was brought in, at the conclusion of the evidence, that he would hear no further testimony in the case, unless something that he did not then know of should occur. As stated, the witness, Chancery, was, subsequent to this, brought in before the argument of the case began. No request of the appellant or his counsel was made of the court to allow this witness to be introduced before the jury. It was his duty, if he desired to use the testimony of this witness before the jury, to have made such request, and on the refusal of the court to allow him to testify, to reserve his bill of exceptions, and bring the question before this court for review. Having failed to pursue this course, he cannot now complain. Several bills of exception are contained in the record which were filed out of term time, and the questions therein raised cannot be considered by this court.

In motion for new trial, the affidavits of Pete Fanning, C. R. Hagan, and W. T. Carroll were presented for the purpose of showing the misconduct of the jury. It appears from these affidavits that the foreman, Hubbard, stated to the rest of the jurors, after they went out and had taken a vote, eight of the jurors being for acquittal, and four only for conviction—that defendant had shot a man while he was sitting on a gallery filing a gin saw, and killed him because he was a witness against him about some cattle, and that said Hubbard also stated that Armstead, Mitchell's brother Jim, went to Houston, to the Central depot, and pretended he was waiting for his brother, and waited until a man that he knew was coming, with a child in his arms, and commenced shooting him. The man fell and drew his pistol, and that there "was two or three men killed and several others shot in the difficulty." And further says that one Wade Robinson, who was on the jury, said to the jury that we know these defendants (meaning the Mitchell boys) and Neal, that were under discussion, and that they were not liable to have any accidental shooting. Hubbard and Robinson said to affiant that he (af-

fiant) was a stranger in the land, and they were telling him these things. Hubbard also stated that he had seen the defendant, playing a game of cards, hold out cards and play them in.   All of which he (affiant) stated was openly talked of in the jury room.   The affidavits of Hagan and Carroll were of similar import to that of Fanning,   There were controverting affidavits filed by nine of the jurors, and the juror, Carroll, himself, made an affidavit that he was not influenced by anything that · was said outside of the evidence in the case.   The juror, Fanning, also swore that he admonished the jurors who spoke on these outside matters that it had nothing to do with the case then on trial.   Nine of the jurors swear positively, in substance, that they were not influenced by anything except the law and the testimony in the case.   The record does not inform us as to what jurors were for conviction before this matter was brought before the jury.   We are not informed, from the record, as to whether or not the parties making the affidavit, Fanning and Hagan, were for conviction or acquittal.   Carroll was not influenced by this matter.   Whether Fanning was or was not, the record is silent.   His affidavit tends to show he was not.   This is remarkably strange.   Let us suppose that they were among the four who were in favor of a conviction.   If this were so, then the fact that appellant had killed another person, or that his brother had murdered some one, certainly did not influence them in finding their verdict.   Nine were not influenced by this matter.   Carroll was not influenced by it, and no juror is shown to have been influenced, either by direct proof or circumstantially.   Then if one had, it would have been a very easy matter to have shown it by proper proof.   The affidavits for the motion for a new trial, and the controverting affidavits were all before the court.   The motion was overruled, and we cannot say that the court abused its discretion, the rule being that the discussion of other crimes which are attributed to the defendant, where it is shown that such discussion influenced the jury, or any number of the jury, in arriving at a verdict of guilty, will be ground for a new trial.   But the mere discussion of other crimes attributed to the defendant where it is not shown that such discussion influenced the jury, or a member thereof, in reaching a verdict of guilty, will not be ground for a new trial or afford a reason for a reversal of the judgment. We would remark, in this connection, that cases are continually coming before us, presenting questions raised by the affidavits of jurors for the purpose of showing some misconduct in the jury room.   Such affidavits should be discouraged, and the lower courts, in any case where it is shown that the jurors are guilty of some misconduct in the jury room, by suggestion of matters outside of the testimony against the defendant, and the discussion of such matters, should bring such jurors before the court, and impose upon them such punishment as such tampering with justice merits.   If this course is pursued, jurors will learn to have more regard for the oaths they have taken, and the courts will be troubled with fewer affidavits made for the purpose of impeaching the verdicts of juries.   It is also insisted by appellant that some of the jurors

did not understand the charge of the court, and affidavits are presented
by some of them to that effect. This court will not listen to such self-
stultifying affidavits on the part of jurors. This question has been too
often decided adversely to appellant to require any further notice from
us. Counsel for appellant also insists that the evidence does not sup-
port this verdict. We are of the opinion that it does. This was a wan-
ton and unprovoked murder. The judgment is affirmed.

*Affirmed.*

---

ON MOTION FOR REHEARING.

HURT, PRESIDING JUDGE.—The appellent was convicted of murder
in the second degree, and given five years in the penitentiary. He
prosecuted an appeal, and the case was affirmed at the Tyler term of
this court, and it now comes before us on motion for a rehearing. Coun-
sel for appellant has filed an able brief, presenting a number of ques-
tions, and insisting that in the affirmance of the case this court committed
several errors, and urging upon us a careful review of the same in order
that correct conclusions may be reached. He has also presented the
same matters in a clear and forcible argument before this court. Aided
by his lucid exposition of the matters involved in the case, we have
again gone over it, and in the light of the argument and authorities cited
have reconsidered all of the assignments, but we will content ourselves
with presenting and discussing only such as are necessary to a proper
disposition of the case, and such as are likely to occur again on another
trial. The appellant again urges that this court erred in holding that
the lower court acted properly in overruling the motion for a contin-
uance and in refusing a new trial based on the action of the court in
overruling said motion. The motion for continuance was based on the
absence of the following witnesses: McNeal, Harvey, King and John-
nie Williams, all residents of Fort Bend County; and of Bland, May-
field Williams, and Chancery, all residents of Harris County. We will
first consider the question of diligence as to these witnesses. The in-
dictment was returned into court on the 27th of September. Subpœnas
were not issued for the witnesses who lived in Fort Bend County until
the 1st of October, and were made returnable on the 9th. The case was
set down for trial on the 9th of October. The subpœna was served on
Williams, but was returned as to McNeal, Harvey, and King, "Not
found." No reason is shown in the application why process for these
witnesses was not issued earlier. For aught that appears, if the subpœna
had been issued at the earliest moment when appellant could have sued
out process, these three witnesses could have been found and served.
On the 30th day of September an attachment was issued to Harris
County for Steve Bland and Mayfield Williams, and on October 2nd an
attachment was issued for Chancery, also to Harris County. The appli-
cation shows that the process for these three witnesses was not placed in
the hands of the officer of Harris County until October 2nd. The ap-

plication shows no reason why process was not sued out earlier for these witnesses, and certainly it should have been shown why the attachment was not issued for Chancery on the 30th of September; and some excuse should have been shown why the attachment to Harris County for Bland and Mayfield Williams was not delivered to the officer until October 2nd. For aught that appears, this process could all have been issued earlier, and have been delivered to the sheriff of Harris County two or three days before it was, and might have been served upon said witnesses, and their attendance secured. In our opinion, there was a lack of diligence as to all the witnesses, both those residing in Fort Bend County and those alleged to live in Harris County. But it is insisted that, although due diligence may not have been used to procure the attendance of these witnesses, if on the motion for a new trial it appears that the testimony of the said absent witnesses is material, and probably true, a new trial should have been granted; and this appears to be the rule in accordance with the authorities in this State. See, Willson's Crim. Stat., § 2186, and authorities there cited. The State's case mainly rested upon the testimony of Sophia Hunter and Annie Collins, in connection with the testimony of Kane Neal, an accomplice; the first two of whom testified that on the night of the shooting they were present, and saw it, and that the defendant, and not Kane Neal, did the shooting. This was a material issue in the case. The defendant introduced three witnesses who testified that they were in view when the shooting occurred, and that it was the taller man of the two who did the shooting. The evidence showed that Kane Neal was much taller than the appellant. Appellant himself testified that Kane Neal did the shooting. Appellant proposed to prove by Bland and Mayfield Williams that they saw the shooting; that Kane Neal did it, and not the defendant. By the witness, McNeal, that he heard the fatal shot, and at the time he saw Sophie Hunter, and she was in such position that she could not have seen it. By King and Harvey that they heard the shot, and at the same time Annie Collins was in their view, and that she could not have seen it. By Johnnie Williams that both Hunter and Collins were mad with the defendant, and he had heard them say they were going to swear against him to get even with him. This witness was served, but was not present. All of this testimony appears to be material—that is, upon a vital issue in the case—and it is in direct conflict with the State's theory and the evidence produced by the State on the subject; and the rule in this regard is, there must not only be such a conflict, but the inculpatory facts should be so strong and convincing as to render the truth of the facts set forth in the application improbable. See, McAdams v. State, 24 Tex. Crim. App., 86. Under the circumstances of this case, we cannot say that the truth of the facts set forth in the application is improbable. But before we leave this branch of the case we would make some further observations on the question of diligence. The record shows that before the argument began the witness, Chancery, was brought into court. Appellant was apprised of the

fact, for his counsel manifested some anxiety to have the account of the witness approved, so he could return to his home. Appellant made no effort to introduce this witness, and according to the application for continuance this witness saw the shooting, and would have testified that Kane Neal did it, and not the defendant. Appellant attempts to excuse himself on the ground that the court stated, when the testimony was closed, that he would hear no more testimony, except on some unforeseen contingency. This announcement was no excuse for the failure to tender the witness. Counsel should have proposed to place him on the stand, and, if the court refused to admit his testimony, he should then have reserved his bill of exceptions. It will be further observed that, although the trial in this case lasted four or five days, no effort was made to procure the attendance of any of the absent witnesses after the trial began. For aught that appears, by the use of reasonable diligence they could have been obtained in time to have testified in the case. Counsel, however, insist that on the overruling of his motion for a continuance he was not able to do any more in the way of diligence, and, no matter if said witnesses were accessible, and could have been produced, that upon the overruling of his motion for a continuance the case was, as to that matter, in statu quo, and this court could not look beyond the time of the overruling of the application for a continuance, as to the question of diligence. The statute places it in the discretion of the court to overrule a motion for a continuance, and then to re-examine the question on motion for a new trial, and to refuse a new trial, unless it should appear that the absent testimony was material, and probably true. And we hold that it is perfectly competent for the court to look to the action of the appellant and his counsel after the overruling of a motion for continuance, in passing upon the materiality or probable truth of the absent testimony. Suppose, in a trial of this character, counsel were informed by the court that the witness was in town, and could be had, and counsel should decline to ask for process to bring the witness before the court, or suppose that afterwards (as in the case of the witness, Chancery,) he should actually come into court, and appellant should decline to use him, would not the court be compelled to hold in such case that appellant was trifling with the court, that the witness would not swear what was alleged, or else appellant did not regard the testimony as probably true? Such occurs to us to be the inevitable conclusion. And thus considering the action of the appellant with reference to these witnesess, we would hesitate to accord a new hearing upon this ground.

Appellant objects to the charge of the court defining the extent of Mitchell's responsibility for the act of Neal, which charge is predicated upon the theory that Neal actually fired the fatal shot. The charge of the court on this subject is as follows: "All persons are principals who are guilty of acting together in the commission of an offense, having a common purpose or agreement to commit such offense. If an offense is committed by one person, and others are present, and, knowing the intent of such person to commit such offense, aid him by acts, or encour-

age him by words or gestures in the commission of such offense, all persons so present and aiding and encouraging or assisting, are principal offenders, and may be prosecuted as such.   You are instructed, that if the defendant and Kane Neal agreed together to commit an assault and battery upon the deceased, or, in the language of the witnesses, to give him a beating, and went to the place where deceased was for that purpose, and did commit an assault and battery upon deceased, and that deceased escaped from them and ran, and the defendant and Kane Neal pursued him, acting together and of common purpose in such pursuit, to overtake the deceased and to give him a beating; and if, while the defendant and said Neal were so engaged in such pursuit, the said Neal drew his pistol, and intentionally shot and killed deceased, and that such act of shooting and killing by Neal was the natural and reasonable result to be arrived at from all of the evidence in the case, of the agreement or common purpose aforesaid between defendant and Neal to give the deceased a beating, or was such an act as might be reasonably anticipated by the defendant as likely or probable to happen in the accomplishment of such purpose aforesaid—then, and in such case, the defendant would be guilty of murder in the second degree.   If, however, all the facts existed, as detailed in the foregoing paragraph of this charge, as to the agreement or purpose between the defendant and Neal to give the deceased a beating, or to commit an assault and battery upon him, and if such agreement or purpose on the part of defendant did not contemplate or embrace the killing of deceased, or the infliction upon him of serious bodily injury, which might reasonably result in his death; and if, while engaged in such pursuit of deceased by defendant and said Neal, the said Neal drew his pistol, and intentionally shot and killed deceased; and if, further, such shooting and killing by Neal did not result reasonably, naturally and probably from the agreement and purpose aforesaid, to give the deceased a beating, and was not reasonably to be anticipated by Mitchell as the likely, probable, and reasonable result which would occur in the accomplishment of such purpose; and, further, if the defendant did not in any way aid, assist, or encourage said Neal in such act of shooting; knowing his intent to shoot—then, in such case the defendant would not be guilty of any offense, and should be acquitted.   If the death of deceased was caused by a shot fired from a pistol in the hands of said Kane Neal, and if such shot was fired accidentally—that is, if the said Neal struck, or struck at the defendant with the pistol, and the pistol was accidentally and without intention on the part of Neal discharged—causing the death of deceased, defendant would not be guilty of any offense, and should be acquitted.   Now, therefore, applying the law as herein given you to the facts in evidence, you are instructed that if you are satisfied by the evidence, beyond a reasonable doubt, that the defendant and Kane Neal sought the deceased for the purpose of committing an assault and battery upon the deceased, both agreeing and concurring in such common purpose, and that they together pursued the deceased for such purpose, and that while so pursuing the deceased the said Kane

Neal drew his pistol, and intentionally shot and killed deceased; and if you further so find that such act of shooting and killing deceased by Neal was the reasonable and probable result of the purpose and agreement aforesaid on the part of defendant and Neal to give the deceased a beating, and was to be reasonably anticipated by defendant as likely and probable to result in the accomplishment of such purpose to assault the deceased, but was not participated in by defendant further than as it might be such probable and reasonable result of such purpose; and if you further find that this occurred in Fort Bend County, Texas, and at the time charged, then in such case you will find the defendant guilty of murder in the second degree, and assess his punishment at confinement in the penitentiary for any term not less than five years. If you find that the shot was fired by the accidental and unintentional discharge of the pistol in the hands of Neal, as herein indicated, or ‚if you have a reasonable doubt on this point, you will acquit the defendant." Appellant insists that the facts of this case do not warrant such a charge, and that the most that can be said is, that the appellant combined with Neal to inflict on the deceased an assault and battery merely, and that the charge in question should not have been given, and, if given, certainly a clean-cut charge, predicated upon the agreement to inflict a mere assault and battery on the deceased should have been given. Appellant insists that the language used by this court in the former opinion on this subject is not the law. Said language is as follows: "If Neal and this appellant agreed and combined to do an unlawful act, such as to beat the deceased, and the deceased was killed by Neal in an attempt to execute the common purpose, the appellant would be guilty of murder, and nothing less, though he had not contemplated the death of the deceased." In this connection, appellant cites us to Blain v. State, 30 Tex. Crim. App., 703, and quotes therefrom as follows: "If two persons combine to assault another with their fists, and one resorts to a deadly weapon and kills, without the other's knowledge or consent, would both be guilty of homicide? would both be guilty of murder? By no means." He also cites us to Stevenson v. State, 17 Tex. Crim. App., 618; Woodworth v. State, 20 Tex. Crim. App., 380; Mercersmith v. State, 8 Tex. Crim. App., 212; Welsh v. State, 3 Tex. Crim. App., 420. These authorities support the contention of the appellant. This question of joint intent in the commission of offenses has frequently been before this court, but inasmuch as perhaps the precise question which the record seems to raise in this case has not been previously decided, we will examine and discuss the authorities on the subject. In Guffee v. State, 8 Tex. Crim. App., 187, it is held: "If one, knowing the unlawful intent of another, joins him in the commission of an offense, both are principal offenders. If one, finding another engaged in an affray, comes to his aid, and takes part in the conflict, his amenability to the law is dependent upon his own acts and intent, and not upon the intent of the other, who, without his knowledge, engaged in or prosecuted the difficulty." To the same effect, see, Foster v. State, 8 Tex. Crim. App., 248, and Snell v. State, 29 Tex. Crim. App., 236.

Mr. Roscoe says, "Although the criminal intent of a single person, who, without the knowledge or assent of his companions, is guilty of homicide, will not involve them in his guilt, yet it is otherwise where all the parties proceed with the intention to do an unlawful act, and with the resolution at the same time to overcome all opposition by force; for if, in pursuance of such resolution, one of the party be guilty of homicide, his companions will be liable to the penalty which he has incurred." See, Rosc. Crim. Ev., p. 713, citing, Fost. Crown Law, 352, and Hawk, P. C., book 2, Chap. 29, § 8.   We quote Mr. Bishop on this subject as follows:  "Whenever one without legal excuse or palliation does what is directly and immediately dangerous to life, any homicide which results therefrom, whether intended or not, is deemed by the law to have proceeded from malice aforethought, and is murder, not manslaughter." See, 2 Bishop's New Crim. Law, § 679.  "Ordinarily, when one without legal excuse so uses a deadly weapon that the death of a human being results therefrom, the law, either conclusively or as a violent presumption of fact, infers malice aforethought, and adjudges the act to be murder." Id., § 680. "Where the intent was to commit only a trespass or a misdemeanor, an accidental killing would be only manslaughter." Id., § 682; citing, State v. Smith, 2 Strob., 77. Mr. Bishop appears to draw a distinction between chastisment or beating where one has the right to inflict punishment and where one has not. " 'Wherever,' says Hawkins, speaking of cases other than parents and the like, 'a person in cool blood, by way of revenge, unlawfully and deliberately beats another in such a manner that he afterwards dies thereof, he is guilty of murder, however unwilling he might have been to have gone so far;' because here, the reader perceives, there is no right of correction, even with a proper instrument.   Yet this doctrine of Hawkins is stated a little too broadly, for if the beating, however wrongful, was neither with a deadly weapon, nor carried to a degree evidently dangerous, and there was no intent to kill, but unfortunately death followed, the offense would be only manslaughter."  2 Bishop's New Crim. Law, § 690, Subdiv. 2.  "One unintentionally taking life in committing a mere criminal misdemeanor of a sort dangerous to life, so that the element of danger concurs with the unlawfulness of the act, commits murder." Id., § 691.  "Hawkins says, 'If a man happen to kill another in the execution of a malicious and deliberate purpose to do him a personal hurt, by wounding or beating him, or in the willful commission of any unlawful act which necessarily tends to raise tumults and quarrels, and consequently cannot but be attended with the danger of personal hurt to some one or other,   *   *   *   he shall be guilty of murder.' " Id., § 691, Subdiv. 4.  "Where the misdemeanor intended and act done to perpetrate it are of a sort not thus directly dangerous to life, if accidentally a homicide results therefrom it is manslaughter." Id., § 692. "If several conspire to invade a man's household, and go to it, armed with deadly weapons, to attack and beat him, whereupon one gets into difficulty with him and kills him, the rest are guilty also of murder, though they did not mean it."   1 Bishop's New

Crim. Law, § 633, Subdiv. 5; citing, Williams v. State, 81 Ala., 1; 1 South., 179. "Where two combine to fight a third with fists, if death accidentally results from a blow inflicted by one, the other also is answerable for the homicide. But if the one resorts to a deadly weapon without the other's knowledge or consent, he only is thus liable." 1 Bishop's New Crim. Law, § 637, Subdiv. 5. Mr. Bishop deduces the following rules on the subject: "The rules to determine responsibility are, in reason, and fairly well deducible from the modern authorities, substantially as follows. One is responsible for what of wrong flows directly from his corrupt intentions, but not, though intending wrong, for the product of another's independent act. If he set in motion the physical power of another, he is liable for its result. If he contemplated the result, he is answerable though it is produced in a manner he did not contemplate. If he did not intend it in kind, yet if it was the ordinary effect of the cause, he is responsible. If he awoke into active and indiscriminate power, he is responsible. If he gave directions vaguely and incautiously, and the person receiving them acted according to what he might have foreseen would be the understanding, he is responsible. But if the wrong done was a fresh and independent product of the mind of the doer, the other is not criminal therein merely because, when it was done, he meant to be a partaker with the doer in a different wrong." Id., § 641. It follows, then, if the authorities cited enunciated the correct doctrine on this subject, that if the defendant and Kane Neal combined together to whip or beat the deceased, and to do so at all hazards, and, if necessary to that end, to take his life, in case he resisted it or fled from it, that one would be responsible for the act of the other. If, in such case, they came upon him, and he resisted being beaten, and, in order to accomplish their common purpose, they either killed him with a picket or a pistol, it would be murder. If he fled from them to avoid being whipped, and they killed him with a picket or a pistol in his flight, it would be murder—that is, if the picket was in its nature, as used, a dangerous and deadly weapon, and what was done with it or with the pistol was directly and immediately dangerous to the life of the deceased; and so, if he submitted, and they beat him with a picket or a pistol, in a manner directly and immediately dangerous to his life, and death resulted, both would have been guilty of murder—that is, if the parties in their joint agreement contemplated the result, the defendant would be answerable, though it was produced in a manner he did not contemplate. If he did not intend it in kind, yet if it was the ordinary effect of the cause, he is responsible. If he awoke into action an indiscriminate power, he is responsible. If, on the other hand, no more was contemplated than a mere misdemeanor, as an assault and battery with the hands and fists, not dangerous to life, and one of the parties, besides the intention of the other, drew a deadly weapon, and stabbed or shot the deceased, then such other is not liable for murder; and such was the idea intended to be conveyed by the language used in the former

opinion of this court. As to the intention of the parties on this subject, we refer to the testimony of the witnesses. Sophia Hunter states in substance, that Lucy and Frank Williams, deceased, were having an altercation in the street, and defendant, Mitchell, came by, and asked what was the matter, and was told that Frank was drunk, and Lucy wanted to tear his clothes off of him, and beat him in the face, and witness was not going to see it done. Defendant told her to turn Lucy loose, and if witness did not he would put her in jail. Frank was cursing. Defendant told him if he did not hush he would have him arrested. It then appears that they went into one Mrs. Longtine's store, and that the row continued between Frank and Lucy. Defendant told Frank to quit cursing. He replied, "I am not bothering you or nobody else. If you want to shoot me you can do it." Defendant left; told deceased to wait until he came back. Witness then hurried the deceased to one Granny Mary's house near by, and shut the door. As she came out she met the defendant and Kane Neal. Defendant asked where Frank was. Witness told him she did not know; that he was not there. He told her to go back and open the door, and witness refused. Then he went to the door, and called Granny Mary, and said if she did not open the door he would shoot it down, and then broke the door open. He called to Frank to come out of there. Frank jumped out of the window. Kane Neal·said, as Frank ran around the back part of the house, "Where is the son-of-a-bitch?" Frank ran to the back of the fence, and tried to get over, when Neal ran there, and hit him with the picket, and defendant also ran there and hit him with a picket. They hit two or three licks with pickets, and he got loose from them, and ran out of the gate, to where witness was, and said, "The white folks are trying to kill me." He said he didn't know what to do; that he was drunk. Witness told him to go to Mr. Darst. After Frank started to run, defendant asked Kane for his gun, and said, "I allowed to beat the son-of-a-bitch, but I can't catch him, so I will kill him," and just as Frank turned the corner defendant shot him. To the same effect is the testimony of Annie Collins. Maggie Longtine testified as to what occurred at her house. She said that Frank was cursing in the house; that he did nothing to Mitchell, but said, "All that you can do is shoot me." Mitchell said he knew what he could do, and went out. Sophia Hunter then took Frank away. Mitchell testified in his own behalf: That he came to Frank and Lucy in the street, who were in a row. He told them that if they did not quit cursing and fighting they would be put in jail. "I passed, and went on up the street, and they ran up the street and into Mrs. Longtine's store." That he (defendant) then went in there. They were still rowing, and Frank was cursing; and witness told him that he must quit cursing in the white lady's house, and get out of there. Deceased said: "What is it to you, you damned white son-of-a-bitch? You put me out." Witness said, "I will put you out, and teach you a lesson." "I did not feel like taking my hands to him, and I went to Mr. Austin's saloon, a

few doors west on Railroad street, to borrow a pistol. I told Mr. Austin what I wanted, and what I wanted to do; that I wanted to put the negro out of the lady's house; and he said he didn't have a pistol; and Kane Neal, who was sitting there, and heard me ask for the pistol, got up, and asked me what was the matter. I asked him if he had a gun. He said, 'No.' He asked me what I wanted with it. I told him a negro was drunk and cursing in a white lady's house, and I wanted to put him out, and give him a beating, to teach him how to behave himself. He said he would go with me, and we would put him out; and I told him to see that the negroes didn't double team on me, and I would throw him out of the house, and give him a good whipping. I intended to give him a good beating for his insolence. As we went from Mrs. Longtine's toward Granny Mary's, I broke a piece of a picket —a piece of a pine board—off of the fence, and carried it in my hand. We both went into the yard. I went to the door, and told Granny to open the door, and she said: 'Shove it open. It ain't locked.' I shoved it open, and it was not even locked. The light blew out. I told Granny to light the lamp, and she lit it with a match. Neal went to the window near the door on the same side the gate is on when we went into the yard, and looked into the room. I was standing with one foot on the step and the other on the ground. Neal called that Frank was getting out of the window, and he (Neal) ran out of the gate, and around to the rear of the yard on the outside. I went out of the gate and started around there, too, but I heard Neal say to deceased, 'Don't you try to get over here.' When the negro ran to the gate and ran out, Neal hollered to me to look out; he was coming. I struck at him with the piece of picket as he ran out. Neal had also run around towards the gate. He was on the outside of the back yard, and he ran past me after Frank, and I followed right after him. The negro ran on towards the corner, with Neal a little ways behind him, and I was behind Neal. Neal had told me he did not have a gun, and I did not know he had one until I saw him strike at the negro with it, just before he got to the corner. He kept the gun out of my sight, and, as he was ahead of me, I did not see him when he got it out. Frank got further ahead when Neal struck at him, and he turned the corner ahead; and when he turned he seemed to hit the bench on Third street. Neal could out-run me. Frank turned the corner into Third street, and just as he struck the bench was faced towards the railroad. Then Neal turned after him, and then I turned just behind Neal about two steps. Frank and Neal were both out at the outside edge of the sidewalk, and I was in next to the house. Just as I got about to where the steps are, and about two steps around the corner —I was still about two steps to the rear and left of Neal—Neal overtook Frank, who was in a stooping posture. Neal was right over and against Frank, and he struck at him again with the pistol, when it went off, and Neal turned around, and instantly said, 'I believe I have played hell.' I turned, too, and went with him, and asked 'Why?' and he said, 'I believe I have shot that negro.'" And they went off. Neal, who

was introduced by the State, testified substantially to the same facts from the time when the defendant came to him that the defendant testified to, except as to the circumstances attending the shooting. He stated that the defendant, while they were in Mud Alley, ran by him, and grabbed his pistol from under his vest, and raised the pistol as if to strike, and it fired.

In our opinion, the circumstances here related, coming both from the State's witnesses and echoed by the defendant, indicate to our minds an ultimate purpose between the parties to inflict a severe beating upon the deceased at all hazards, and a beating, judged by the expressions of the defendant himself, of a dangerous character, and calculated to jeopardize the deceased's life, or to inflict upon him such serious bodily injury as might endanger his life. To use his own language, "He wouldn't take his hands to him;" "that he would teach him a lesson;" and he went immediately to get a pistol; and he declared his purpose to throw him out of the window, and give him a good beating; and on the way he pulled from the fence a picket, but its size and weight are not disclosed—evidently of such a kind as is commonly used for fencing, as it was pulled from a fence. Such an ordinary picket in the hands of an ordinary man, is calculated, when used as a weapon, to inflict serious bodily injury. And, moreover, the defendant himself relates that in the pursuit, and some little space before deceased was killed, he saw Kane Neal draw a pistol, and strike at the defendant, yet he makes no protestation against such use, but continues with him in the pursuit until the deceased is slain. In the face of this testimony of the defendant alone, to say nothing about the evidence given on the part of the State, the court was amply justified in giving the charge he did, and enunciated a correct rule of law. However, in addition to the charge given, the court should have presented a substantive charge to the effect that, if such was not the purpose and intent of the defendant, but defendant acted in the matter merely to inflict upon the deceased an ordinary assault and battery, which is a misdemeanor, and that Neal, besides the intent and purpose of the defendant, shot and killed the deceased intentionally, the defendant could not be convicted of a greater offense than assault and battery. The court should have further instructed the jury, if Neal, under such circumstances, struck at the deceased with his pistol, not with the intention of killing him, and he fired, and accidentally killed the deceased, under such circumstances the appellant only could be found guilty of assault and battery. The court, on this last-mentioned subject, instructed the jury in such event to acquit the defendant if the killing was the result of an accidental shooting by Neal. That the charge to acquit under such circumstances, is more liberal to defendant is not the question. It is not the law of the case, and the jury, under a proper charge, might have been willing to have convicted the defendant of assault and battery, whereas they may not have been willing to acquit him entirely. The rule is, that it is the duty of the court to give in charge every phase of the case which the evidence establishes, or tends to establish. "If there is any

evidence tending, though slightly, to establish a defense, the defendant is entitled to a charge directly upon that point, no matter what view the court may entertain of the weight and value of the testimony." See, Scott v. State, 10 Tex. Crim. App., 113; Guffee v. State, 8 Tex. Crim. App., 187. The court also omitted to charge the jury if the defendant did the shooting and killing, and it may have been accidental, as to his liability, as there was some testimony tending to establish this phase, a charge presenting this subject to the jury should have been given in a charge presenting negligent homicide of the second degree.

In the former opinion of this court we held that the misconduct of the jury in receiving other evidence after they had retired to the jury room was sufficiently met by counter affidavits to show that the jury were not influenced thereby, and that consequently it afforded no ground for the reversal of the case. On motion for rehearing, our attention has been directly drawn to the character of counter affidavits, and it occurs to us from a close inspection of said affidavits that the rebutting affidavits do not meet and controvert the more essential features of the affidavits introduced by appellant. Moreover, from the argument made, we have had our attention more pointedly attracted to the statute authorizing new trials on this ground, and the construction thereof, and we are inclined to the opinion that the terms of said statute are mandatory; and, where the jury have received new evidence after they have retired to the jury room, especially of a material character, that the right to a new trial is mandatory. The affidavit of the juror, Fanning, shows that he was on the jury that tried the defendant in this case. He says that after the jury had retired to consider their verdict, on the first vote taken, eight of the twelve jurymen voted to acquit the defendant; that after that one of the jurors—the foreman, Hubbard—stated to the jury that the defendant had shot a man in the back while he was sitting down on a gallery filing a gin saw, and killed him, because the man was a witness about some cattle. He also stated that he had seen the defendant playing a game of cards, and he had held out cards and played them in. And also stated that Jim Mitchell, brother of the defendant, went to Houston, provided himself with a pistol, and pretended to be waiting at the Central depot for his brother, the defendant; and waited until a man that he knew was coming, with a child in his arms, and commenced shooting him. The man fell, and drew his pistol, and that there were two or three men killed and several others shot in the difficulty. And affiant further stated that Wade Robinson, who was on the jury, said to the jury that, "We know these boys" (meaning the Mitchell boys), "and Neal, and that they were not liable to have any accidental shooting." Foreman Hubbard and Robinson said to affiant that, as he was a stranger in the land, they were telling him these things. This was openly talked in the jury room. And to the same effect is the affidavit of the jurors, Hagan and Carroll. These two jurors further stated: "That Hubbard and Robinson stated that if the jury did not return a verdict they would be carried around four or five coun-

ties of the district by the judge. They further stated that eight of the jurors were influenced in finding the verdict of conviction by the statements made by said Hubbard and Robinson. The juror, W. T. Carroll, further stated that said Hubbard and Robinson stated to the jury that the defendant, A. H. Mitchell, and his brother, were bad men, and that the jury ought to convict the defendant on his bad character, saying to the other jurors that they did not know the bad character of the defendant, as they—Hubbard and Robinson—did; that said Hubbard and Robinson used these statements to other jurors, who, until almost the last moment of their deliberations, had uniformly voted to acquit the defendant, A. H. Mitchell, of the charge of which they were trying him, as arguments for the conviction of the defendant." The record also contains the affidavit of the counsel for the appellant, which recites that when they accepted the jurors, Hubbard and Robinson, when they were examined on their voir dire examination, they each disclaimed bias or prejudice, or any conclusion as to the guilt or innocence of the accused, and each qualified himself as a competent juror to sit upon and try said case, and was accepted by appellant as such, before his peremptory challenges were exhausted. The State met these affidavits with counter affidavits. The jurors, Hubbard, Robinson, Winer, Hagan, Horton, Walker, Smith, Lones, and Kageler, being nine of the jurors, stated in their affidavit that they tried and decided the above case under the law as given by the court, as they understood it upon a careful reading of the charge and the evidence as adduced during the trial; that each and every one rendered his verdict in accordance with the law and evidence sworn to by the witnesses, and that they were not influenced or persuaded by any outside pressure whatever; and that, so far as their knowledge and belief went, no attempt was made by any juror to influence any juror in his verdict by anything outside of the law and the evidence in the case. The jurors, Hubbard and Robinson, also made an affidavit from which the following is extracted, to-wit: They say that they have read the affidavit of Carroll, one of the jurors, "and they say under oath that in that part of said affidavit where said Carroll uses the following words, to-wit: 'And that the defendant, A. H. Mitchell, and his brother were bad men, and that the jury ought to convict the defendant on account of his bad character, saying to the other jurors that they did not know the bad character of the defendant, as he—Hubbard and Robinson—did; that said Robinson and Hubbard used these statements to the other jurors, who, until almost the last moment of their deliberations, had uniformly voted to acquit the defendant, A. H. Mitchell, of the charge of which they were trying him, as arguments for the conviction of the said defendant, Mitchell.' The said Hubbard and Robinson say that said language made and sworn to by said W. T. Carroll in his affidavit made and filed in motion for a new trial is wholly untrue and false, and that they pronounce it a fabrication, and so testify under their oath that no such language was used by them, or either of them, on the trial of said case." To the same effect is the affidavit of

the jurors, Bob Smith, W. P. Winer, D. M. Walker, J. H. Lones, A. J. Horton, and F. Kageler; and also the juror, W. T. Carroll, made an affidavit in which he stated that he is now satisfied, and was at the time said verdict was rendered, and that he rendered his verdict according to the law and the evidence as he understood it. It will be noticed here that the affidavits attempting to controvert the facts alleged in the motion, as made by the jurors, Hubbard and Robinson, corroborated by the jurors, Winer, Smith, Walker, Lones, Horton, and Kageler, do not attempt to controvert the affidavits of the jurors furnished by the appellant as to the facts stated in the affidavits of Fanning, Hagan, and Carroll, as above stated. They only propose to question the last affidavit of W. T. Carroll, above set out, in which said Carroll stated that the jurors, Hubbard and Robinson, stated to the jury that the defendant and his brothers were bad men, and that the jury ought to convict him on account of his bad character, stating to the other jurors that they did not know the bad character of the defendant as they—Hubbard and Robinson—did; and the affidavits even meeting this question are couched in the most general terms, and do not state that language of similar import was not used, but simply state that no such language was ever used by them, or either of them, on the trial of said case. It is highly probable that the exact language could not be stated in this regard, and to have entirely met the question the affidavit should have stated that neither the language nor any of similar import was used. But it will be observed that these affidavits do not gainsay or controvert the fact that after the jury had retired to the jury room, and after eight had voted for acquittal and only four for conviction, that during the discussion of the evidence and the charge the juror, Hubbard, who was foreman, and the juror, Robinson, stated to the jury that the defendant had shot a man in the back while he was sitting on a gallery filing a gin saw, and killed him, because he was a witness against him about some cattle, and that they had seen the defendant playing at a game of cards, and saw him holding out cards; and the further statement that the brother of the defendant had killed a number of men at Houston by taking an unfair advantage of them, and that they were not men liable to shoot a man by accident. These facts stand uncontradicted by the State. No effort is made to controvert them, and that they were testimony of a most material character seems to be evident. As the defendant testified in the case, if he had been indicted for a previous homicide, there might have been permitted to be shown, as bearing upon his credit, the fact of such previous indictment. But in such case it would have been the bounden duty of the court to limit the testimony to its specific purpose, but this testimony went to the jury without limitation, and went to the jury when the defendant had no opportunity to meet it or cross-examine the witnesses, or to bring rebutting testimony. Moreover, it was an issue in the case whether or not the shooting was accidental. These witnesses in the jury room, after reciting the facts, speak as to the character of the defendant and his brother, and Neal, as

men who were not liable to do accidental shooting, and that they were bad men, and ought to be convicted on that account. This testimony, coming in this shape, at a time when the defendant had no opportunity to meet it, was calculated to have a powerful effect against him, and evidently it must have had, because for no other assigned reason the jury changed from a majority of eight in number for acquittal to an unanimous verdict for conviction. It is no answer to this proposition to say that nine or ten of the jury made affidavits that they found their verdict upon the law and the evidence, and that they were not influenced by any outside pressure. Such an affidavit is to be expected from jurors seeking to justify themselves for their own misconduct, and to escape a responsibility imposed upon them by their oaths, which an admission that they were otherwise influenced would entail. The jurors by such means cannot escape the impeachment that their verdict was tainted by this improper evidence. At least, the record here before us, when critically examined, fails to disclose or show any other reason for the change in the status of the jury on the question of the guilt or innocence of the defendant. In our opinion, for the reason that the jury received evidence after their retirement into the jury room, this case should be reversed, if for no other reason. In respect to the question, which, so far as we know, is a new one in this State, as to whether this should be classed under the seventh or eighth subdivision of Art. 817, Code Crim. Proc., 1895. On an examination thereof, we are inclined to the opinion that, the reception of the testimony by the jury, after they had retired to their jury room, might be considered a species of misconduct of the jury, and so come under the eighth subdivision, if it were not specially provided for under the seventh subdivision. The subdivision relating to this matter reads as follows: "A new trial shall be granted: (7) Where the jury, after having retired to deliberate upon a case, have received other testimony; or where a juror has conversed with any person in regard to the case; or where any juror, at any time during the trial or after retiring, may have become so intoxicated as to render it probable his verdict was influenced thereby. But the mere drinking of liquor by a juror shall not be sufficient ground for granting a new trial." It would appear from this, that if the jury received other testimony after having retired to deliberate upon a case, a new trial is mandatory. Certainly it would be so where the testimony is of a material character, and it makes no difference whether the jury received this testimony from one of their number, or from others. Prior to the adoption of the Code of 1879, there existed in the Code Crim. Proc, Art. 616 (1 Pasch. Dig., p. 528), the following provisions: "If any juror has knowledge of any fact connected with the case on trial, it is his duty to make it known before the case is finally submitted. Should he fail to do this, he may come into the court with the other jurors, after their retirement, and shall be sworn as a witness, and give his testimony." At that time there was no provision in the Code disqualifying a juror as a witness. In the

adoption of the Code in 1879, this article, 616, was repealed by its omission, and a new disqualification of a juror was inserted, to-wit: "That he is a witness in the case." Code Crim. Proc. 1895, Art. 673. It would appear from this that it was the purpose and design of the legislature to get rid of all persons who might be witnesses from the jury, and to allow a person with knowledge of the facts to get upon the jury, and promulgate them in the jury room, would be a vain attempt to ignore the statute. Though the receiving of evidence by the jury, as in this case, after they had retired to their jury room, has been heretofore in cases termed "misconduct of the jury," in our opinion, while in a general sense, it is a misconduct, it falls under subdivision 7, and not subdivision 8, of Article 817; and for the reception of such evidence, where it is material, this court has invariably reversed the case. See, Wharton v. State, 45 Texas, 2; McKissick v. State, 26 Tex. Crim. App., 673; Anschicks v. State, 6 Tex. Crim. App., 524; Hargrove v. State, 33 Tex. Crim. Rep., 431; Ellis v. State, 33 Tex. Crim. Rep., 508.

Another question presented is as to the bias and prejudice of the jurors, Hubbard and Robinson. We have previously observed that both of these jurors qualified themselves to try the case. Each answered that they had no bias or prejudice in favor of or against the defendant, and were taken on the jury by the appellant with that understanding, and he had no knowledge to the contrary until after the rendition of the verdict. And on this account, he was afforded no opportunity of challenging them. The statute is imperative on this subject, and if the juror answers, when he is being tested, that he has bias or prejudice in favor of or against the defendant, he is subject to a challenge for cause. The law does not stop to inquire as to the grounds of his bias or prejudice, but considers him disqualified to sit in the case. The evidence in this case establishes beyond question that, although these men may have answered (we may presume honestly, as the vice of prejudice or bias is that it renders its possessor blind to the fact of its possession) that they had no bias or prejudice, they were greatly prejudiced against the appellant. Mr. Webster defines "bias" as follows: "A leaning of the mind; propensity towards an object, not leaving the mind indifferent; inclination; prepossession; bent." He defines "prejudice" in this wise: "An opinion or decision of mind formed without due examination; prejudgment; a bias or leaning towards one side or the other of a question from other considerations than those belonging to it; an unreasonable predilection or prepossession for or against anything; especially an opinion or leaning adverse to anything, formed without proper grounds or before suitable knowledge." It is not necessary here to reiterate the facts stated by these jurors, Hubbard and Robinson, to the other members of the jury in the jury room. If they do not indicate prejudice against him, it would be difficult to find a case in which the English language would convey terms expressive of ill will and animosity against a person. See, Long v. State, 10 Tex. Crim. App., 186; Hanks v. State, 21

Texas, 526; Henrie v. State, 41 Texas, 573; Washburn v. State, 31 Tex. Crim. Rep., 352; Sewell v. State, 15 Tex. Crim. App., 56.

The views herein expressed do not accord with some of the views expressed in the opinion heretofore rendered in this case, but, as stated, we have given the questions here presented a more thorough and critical examination, and the points here decided are in accord, we believe, with correct principle, and in consonance with the decisions of our courts on the subject. For the errors pointed out, a new hearing is granted, and the judgment of the lower court is reversed, and the cause remanded. Rehearing granted and judgment reversed.

*Reversed and Remanded.*