## L. T. MORGAN v. THE STATE.

### No. 2433. Decided March 13, 1902.

**1.—Murder—Charge as to Manslaughter.**

On a trial for murder, where it appeared that defendant, without provocation, assaulted the brother of deceased in a nonfelonious manner, who, getting loose from him, ran and hid himself, and deceased appeared with a knife as his brother retreated, and defendant knocked him off, whereupon he grabbed an ax handle, and as he approached defendant with it for the purpose of striking him, defendant cursed and shot at him; and thereupon deceased threw down the ax handle and ran out of the house and defendant pursued and killed him; and the difficulty between defendant and deceased's brother having terminated before deceased appeared on the scene; Held, a charge upon manslaughter was correct and directly applicable to these facts, which instructed the jury, in effect, that if defendant was engaged in a difficulty with deceased's brother, and struck him and brought on said difficulty, but which difficulty had ended; and at that juncture deceased attacked defendant either with a knife or ax handle, and such attack was sufficient to produce, and did produce, in defendant's mind anger, rage, sudden resentment, or terror sufficient to render it incapable of cool reflection, and that in a few seconds thereafter before there was time for the mind to become cool and deliberate, defendant did shoot and kill deceased, then, if he was not justified, he would only be guilty of manslaughter. The charge was moreover favorable to defendant.

**2.—Same—Charge as to Self-Defense.**

Upon the facts stated in paragraph 1, the charge of the court was correct and directly applicable, which in effect instructed the jury that if defendant brought on the difficulty with the brother of deceased, with no intention of killing him, but simply struck him with his fist, and that said difficulty was ended by the withdrawal or departure of deceased's brother, and if at that juncture deceased made an attack on defendant with a knife or ax handle which produced in the mind of defendant a reasonable fear of great bodily injury, then defendant would be justified in shooting and killing him If, however, deceased fled and abandoned the conflict, and all danger, real or apparent, to defendant had ceased, he would not be justified in pursuing and killing deceased unless defendant believed from the appearances as presented to him that deceased was only fleeing to gain vantage ground from which he could renew the attack.

**3.—Charge—Mistake in Inserting "Deceased" Where "Defendant" Should Have Been Used.**

A mistake in inserting "deceased" where "defendant" was the word which should have been used in the charge, could not mislead or confuse the jury where, from the whole charge, it was apparent that the mistake had inadvertently been made.

**4.—Same—Predicating Manslaughter and Self-Defense Upon the Last Shot Fired by Defendant.**

On a trial for murder, where two shots were fired by defendant, a few seconds intervening between them, it was not error for the court to predicate its charge upon manslaughter and self-defense upon the last shot, where it clearly appeared by the evidence that the last shot was the fatal shot.

**5.—Special Venire—Summoning and Impaneling Jurymen Not Drawn by Commissioners.**

Where there were two persons in the county, father-in-law and son-in-law, of the same name, the father being J. H., Sr., and the son J. H., Jr., and the son-in-law had been summoned, but he and his father-in-law had agreed that the latter should serve, and he did attend, was selected as a juror, and sat in the case; Held, defendant could not complain, as it was his duty to have informed himself as to the facts before he passed upon and selected said juror.

Appeal from the District Court of Fayette. Tried below before Hon. L. W. Moore.

Appeal from a conviction of murder in the second degree; penalty, five years imprisonment in the penitentiary.

Appellant was charged with the murder of Charley Barnhill, on the 6th day of December, 1900, by shooting him with a pistol.

The opinion states substantially the facts in the case.

*Brown, Lane & Garwood* and *Wolters & Lane,* for appellant, filed an able and elaborate printed brief.

*Robson & Duncan* and *Rob't A. John,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of five years, hence this appeal.

The difficulty over which this homicide resulted grew out of a difference between the parties in regard to the payment of $33.50, being a fine assessed against a negro by the name of Ligon. Deceased, Charley Barnhill, and his brother Will, together with defendant L. T. Morgan, and his two brothers, John and Will, composed the firm of Morgan & Barnhill, doing a mercantile business at Plum, Fayette County. The Barnhills appear to have conducted the business, but the Morgans were interested in the firm. The Morgans were engaged in other business in the same town, defendant himself owning and running a saloon situated about thirty yards north of the store. In the spring of the year 1900, the negro Ligon was fined for some misdemeanor; the fine and costs amounting to $33.50. According to the statement of Will Barnhill, appellant requested him to pay the amount of the fine and costs, but said nothing about it being charged against the firm. The fine was paid by Will Barnhill by an order against appellant L. T. Morgan, whose name Will Barnhill was authorized to sign, and no charge was made against the firm for said amount. According to appellant, the order should have been a charge against the firm. He states that when he received the receipt he did not notice that the fine was shown to have been paid by him; but later in the fall he noticed that the receipt was against him. About two weeks before the homicide he called on Will Barnhill, the bookkeeper, and asked him about it, Charles, deceased, then being absent on a hunt. Will said he did not know anything about it, but as soon as Charley came back he would do what was right about it. On the day of the homicide, about a half hour to an hour before it occurred, appellant called at the store to see about the matter. Charley Barnhill, deceased, was then sitting in the store. He first approached him and asked him in regard to it. He told him that he did not know anything about it; that Will had attended to it. Appellant then walked back to the rear end of the store to the office, where Will was. (The office was on a raised floor, five or six feet above the store floor, and was approached by a flight or five or six steps. Underneath the office was

a cellar, which had two approaches, one from the store by a door under the office and near the steps, and the other from the outside by a rear door. There was also an east door of the store, called a side door.) When appellant went up into the office where Will was, the testimony shows substantially that he asked him, how it was about Ligon's fine; that he told him Charley had sent the order to the justice and that Charley had told him that Will had sent it; that it seemed to him (appellant) the Barnhills were pulling for themselves. Will replied, that he was pulling for himself. Appellant said that he then struck Will with his open hand or fist. Will says that he struck him with his open hand or fist, and as he grabbed at appellant, he stabbed at him with a knife, and he caught the point of the blade in his hand and was cut. He then pushed or shoved appellant out of the way and hurried down the steps of the office. At this juncture deceased, Charles Barnhill, came from towards the front of the store and started up the steps. According to the witnesses for the State, he passed Will as he ran down the steps and met appellant about the head of the steps, and he grabbed or struck at appellant with his open hand or fist, and according to one of appellant's witnesses, he struck at him with a knife. Appellant himself testifies that he thought he had a knife, and he thought that he cut him. At this juncture appellant either struck and pushed deceased off the steps, or deceased jumped off the steps on the floor and immediately grabbed an ax handle from a barrel near by, and started up the steps towards appellant with this in his hand. At this, according to appellant, he said, "God damn you, put that ax handle down, or I will kill you," and then he shot; that deceased, who was about one-third of the way up the steps, immediately dropped the ax handle and ran out at the side door; and according to appellant's evidence he immediately pursued him out of said door and around the northeast corner of the house. Deceased ran into the cellar; appellant came to the door and saw deceased standing by the meat stand with his left foot upon the meat stand and slightly leaning forward. He was on the right side of the meat stand on entering the door. His right side was to appellant, and he immediately fired. Appellant says that it was dark in the cellar, and he did not know but that deceased would get a butcher knife and jab it into him. State's witness Korenck, the only other witness who testified as to what occurred in the cellar, states that when the difficulty began in the office he ran into the cellar to hide; that after he was in there a short time he heard a shot fired back near the steps leading to the office; that he opened the back door of the cellar and looked out and saw Charley Barnhill at the corner of the house; he had his hands on the corner of the house, looking first to one side and then to the other; that is, looking towards where witness was, and then towards the east side of the store; that he had nothing in his hand that he could see. Directly he saw deceased run towards where witness was, and then saw defendant run after him with a pistol in his hand; that

he (witness) ran behind a cedar post in the cellar. Deceased entered the cellar and crouched down against the wall behind the oil tank, which was on the right of the cellar door, and with his left foot rest-ing upon the meat stand, his back towards the meat stand and his face towards the wall, and with his hands spread out on the wall, looking towards the door sideways, over his right shoulder. Defendant came to the cellar door, a few steps behind deceased. He approached the door a few seconds after deceased had come into the cellar. As he reached the door he sorter checked up and looked in there, and shot deceased. It was shown that deceased received one shot, which passed through his right arm into and through his body.

Inasmuch as the court's charge is criticised with reference to the cessation of the difficulty between appellant and Will Barnhill in the office, we will state so much of the evidence as bears on that question. Will Barnhill's testimony shows that he retreated from the office as soon as he could get loose from appellant, went down the steps and thence into the cellar, through the store door, and hid there; that as he came down the steps he met Charley Barnhill going up the steps; that he remained hid in the cellar until after deceased was killed; and the first he knew of this was when a brother of appellant came to the cellar door and told appellant, "You have killed Charley, and we are ruined," and then he attempted to go to his brother, and appellant would not let him. Appellant testified that when Will Barnhill started down the steps he thought the difficulty was ended; that he followed behind him, thinking the whole thing was over; that Will disappeared as Charley came up the steps. He further testified that when he pursued Charley Barnhill, that he wanted to stop him, and told him to halt; that at that time he did not know what had become of Will, and did not know what he would do next.

This is a sufficient presentation of the testimony to discuss the issues which arise on the charge of the court.

The court gave a charge on murder in the first and second degrees, on manslaughter, and on self-defense. Appellant particularly criticises the charge of the court on manslaughter. The court first defined man-slaughter, and among other things instructed the jury, that the passion must arise from a provocation given at the time of the homicide; but further instructed them, that it was their duty in determining the adequacy of the provocation to consider in connection therewith all the facts and circumstances in evidence in the case; and if such facts and circumstances are sufficient to produce passion in a person of ordinary temper, then the law with reference to adequate cause was sufficiently satisfied, etc. And then gave a charge, applying in a general way the law to the facts of the case. That is, the court instructed the jury if they believed from the evidence beyond a reasonable doubt that defend-ant killed deceased in a sudden transport of passion aroused by ade-quate cause, as the same has been explained to you, to find defendant guilty of manslaughter, etc. The court further instructed the jury on

this subject, as follows: "If the jury believe from the evidence that defendant was engaged in a difficulty with William Barnhill, in which defendant struck him, and that defendant brought on said difficulty; if you further find that said difficulty had ended, and at that juncture deceased, a brother of said William, attacked, either with a knife or an ax handle, defendant, and that said attack was adequate cause to produce and did produce that state of mind referred to; that is, of anger, rage, sudden resentment, or terror, sufficient to render it incapable of cool reflection; and if you further believe that in a few seconds thereafter, before there was time for the mind to become cool and deliberate, defendant did shoot and kill deceased, if he was not justified, then he is guilty of manslaughter," etc. This charge is objected to on the ground that the jury are required to believe that the former difficulty between defendant and Will Barnhill had ceased before they could find defendant guilty of manslaughter; that is, it was tantamount to telling the jury that, if Charley Barnhill, deceased, interfered while the difficulty was still pending between appellant and Will Barnhill, although appellant was making no felonious assault on said Will Barnhill and Charley Barnhill at that juncture interfered and made an excessive assault upon appellant, that it would be murder for appellant in resisting said assault to take the life of Charley Barnhill, notwithstanding his mind at the time was under the influence of sudden terror, arising from an adequate cause. That is, the charge operated, as maintained by appellant, to withdraw the defense of manslaughter from the consideration of the jury altogether. Of course, if the effect of the charge was to withdraw the issue of manslaughter from the consideration of the jury it was error. As we understand the law, if appellant assaulted Will Barnhill, with no felonious intent, and Will in turn made an assault on appellant with a deadly weapon, and appellant thereupon had drawn a weapon and slain Will Barnhill, the case would be one of imperfect self-defense, and the killing under such circumstances would be manslaughter; and the same result would follow if Charles Barnhill had interfered during the progress of the difficulty and had attacked appellant with a deadly weapon, and appellant, in defense of such assault, had slain Charley Barnhill. But did the killing occur pending the difficulty between appellant and Will Barnhill? As we read the record, so far as any difficulty was concerned between them, it was all on the part of appellant. According to Will Barnhill's testimony, he was assaulted by appellant, and he did no more than to shove or push him out of the way so as to effect his escape; and we understand this to be the effect of the testimony of appellant himself. According to his evidence, without any provocation on the part of Will Barnhill (unless it be considered provocation for one person, when sharply spoken to by another, that he seemed "to be pulling for himself," to respond that he was), he struck him in the face with his hand or fist; that Will then grabbed him, when he shoved or knocked him loose and he started down the steps; that appellant followed after him. Appellant says he "thought the

whole thing was over." Will ran down the steps, and according to the entire testimony he did not again appear upon the scene, but ran to the cellar and hid himself. Charley Barnhill, at this juncture came running up the steps, as appellant believed, with a knife; he was either knocked off the steps, or jumped off, and grabbed an ax handle, and no more is seen by any witness of a knife. On his attempting to come up the steps with the ax handle, evidently for the purpose of striking appellant with the same, appellant cursed him and told him if he did not put it down he would kill him, and immediately shot at him. Thereupon deceased threw down the ax handle and ran out of the house. Now this is the whole difficulty that occurred in the office, and on which the court's charge on manslaughter was predicated. Now, as a fact, the difficulty between Will and appellant, if it could be termed a difficulty, had terminated, and he was fleeing from the scene, and from appellant's own standpoint it had ceased. We do not understand that the court is required to do more than to address his charge upon the actual state of facts, or upon the apparent state of facts. We have seen, both actually and apparently, when Charley Barnhill appeared on the scene, whatever difficulty had existed between appellant and Will had come to an end, and the court did not commit an error in predicating its charge upon the facts proven. In what has been said, of course, it is assumed that appellant's assault on Will was of a nonfelonious character; and this follows appellant's testimony, and ignores Will's to the effect that appellant, in the assault on him, cut him with a knife; and furthermore, ignores that phase of the testimony which shows that appellant came to the place armed, and the moment he was interfered with in his purpose to assault Will Barnhill, drew his weapon. But appellant was entitled to have a charge predicated on his own testimony, and from his own standpoint; and we understand that the court gave such a charge in his favor in the charge complained of. More than this, the court gave a general charge authorizing the jury to look to the provocation occasioned by Charley Barnhill, and to all the facts and circumstances in evidence shedding light thereon, as adequate cause; and if the jury believed that such was adequate cause, and passion was engendered thereby, to find defendant guilty only of manslaughter.

Appellant also complains of the court's charge on self-defense. We have examined this record carefully, and to our minds there is no self-defense in the case. But if appellant was entitled to a charge on that issue, he had the full benefit thereof. On that subject the court gave substantially the following charge: "If defendant brought on a difficulty with William Barnhill by striking him with his fist, but with no intention of bringing on the difficulty for the purpose of killing him, and that such difficulty was ended by the withdrawal or departure of said William from said difficulty, and if at that juncture Charley Barnhill made an attack on defendant with a knife or ax handle, if said attack produced in the mind of defendant a reasonable fear of great bodily injury, then the *deceased* would be justified in shooting and kill-

ing deceased." "If, however, at that juncture, deceased fled and abandoned the conflict, and all danger, real or apparent, to defendant had ceased, he would not be justified in pursuing and killing deceased, unless defendant believed from the appearances, as presented to him, that deceased was only fleeing to gain a vantage ground from which he could renew the attack." This charge is criticised on the same account as the charge on manslaughter; that is, it predicated the right of self-defense on the termination of the difficulty between Will and defendant, and because it improperly limited appellant's right of pursuit; that he had a right to pursue his adversary until all danger, real or apparent, had ceased, and not simply on the ground of his belief that deceased was seeking a vantage ground to renew the conflict; and because the latter portion of the charge is confused, in that it put the word "deceased" where "defendant" should have been used. It occurs to us, with reference to the first proposition, that what has been heretofore said as to the charge of the court on manslaughter, is applicable to the charge on self-defense, by a stronger reason. We based our holding as to the charge of manslaughter on the ground that the charge was simply responsive to the facts; but here, if appellant was in the wrong in bringing on the difficulty with Will Barnhill, and assaulted him, he would not have the perfect right of self-defense, as against Charles Barnhill, until that previous difficulty had ceased. Nor, in our opinion, does the charge of the court as to the flight of deceased, and appellant's self-defense in that connection, impinge upon his rights. The jury were told that if all danger, real or apparent, had ceased, defendant had no right to pursue and kill him. This, we understand to be the law. But if he reasonably believed that defendant's flight was feigned, and he was seeking a vantage ground to renew the attack on him, then he could pursue and slay him. Obviously, from appellant's standpoint, there could be no other danger on account of deceased's flight, save that he was seeking to gain an advantage, so as to renew the conflict. If he ever had a knife he had abandoned that; he had thrown the ax handle away. He had nothing with which to renew the combat. To our minds the charge of the court was tantamount to telling the jury that he had a right to pursue his adversary until all danger, real or apparent, had ceased; and he was secure from any further attack on the part of deceased. As to the latter portion of the charge, we think the use of the word "deceased" where "defendant" should have occurred did not mislead or confuse the jury to the injury of appellant. They understood the charge from what had gone before, and what succeeded as applying the right of self-defense to appellant. We understand also it to be objected by appellant, both as to the charge on manslaughter and self-defense, that they were predicated on the idea that the last shot fired by appellant killed deceased. It does not occur to us that there is any question as to this proposition. Shot as deceased was, evidently through the heart, he could not have gone the distance he is shown to have traveled

after the first shot before expiring; and it occurs to us that if the first shot had taken effect that he could have been trailed by his blood from there to the cellar; and in addition he is shown to have fallen and expired immediately after the last shot in the cellar. We accordingly do not believe there was any error in the court basing his charge on the proposition that the last shot was the fatal shot.

In connection with the court's charge on self-defense we would also note the fact, that the judge gave a special requested instruction on this phase of the case, to the effect, that appellant had a right to arm himself and seek an explanation from Will Barnhill in regard to their business misunderstanding, provided he did not intend to provoke a difficulty with said Barnhills, or either of them; and if, under such circumstances Charley Barnhill made an assault upon him with a knife or an ax handle, which caused him to believe his life was in danger or he was in danger of serious bodily injury, that he would be justified in slaying him. As stated before, we do not believe this record presents a case of self-defense. But concede that it does, the rights of appellant were amply protected in that respect.

We have examined the several requested instructions, and believe the court's charge fully covered every phase of the case; and if any of the requested instructions were applicable, it was not necessary for the court to have given them.

Appellant insists that this case should be reversed, because a juror sat in the case who had not been summoned by the deputy sheriff, as a special venireman in the case. That is, it appears there were two John Hruskas in Fayette County; John Hruska, Jr., of Ellinger, the son-in-law of John Hruska of Fayetteville. Appellant claims that John Hruska of Ellinger was the party summoned, and that he exchanged with his father-in-law, John Hruska of Fayetteville, who agreed to serve in his place. However, it is not made to appear which one of the said Hruskas was actually drawn by the jury commissioners. However, the testimony shows that the Hruska of Ellinger was the party actually summoned by the sheriff, and that after he and his father-in-law made an agreement that the latter should take his place. It appears that the Fayetteville Hruska did attend and was selected as a juror, and sat in the case. Appellant complains that after he got the special venire he consulted certain friends about the John Hruska of Ellinger, and agreed to take him; but it seems that said friends were not conveniently near, at least they were not consulted at the time the jury was made up, in order to identify the Hruska taken as the one they had consulted about. It occurs to us that the Hruska taken, being in all respects a competent juror, appellant can not complain. If he did not get the one he wanted, he should have better informed himself prior to passing on the juror. We do not think there was any error in this matter.

We have examined the record carefully, and in our opinion the evidence amply supports the verdict. If there was no other evidence of

malice than this record furnishes as to the circumstances attending this killing, it would be ample, as manifesting beyond any reasonable doubt that appellant, at the time, was possessed of a heart utterly devoid of social duty and fatally bent on mischief.

There being no error in the record, the judgment is affirmed.

*Affirmed.*