LOTTIE GILES v. THE STATE.

No. 6135.   Decided June 1, 1921.

1.—Murder—Continuance—Diligence—Materiality of Testimony.

Where, upon trial of murder, the application for continuance showed sufficient diligence and the materiality of the alleged absent testimony, the same should have been granted and the refusal to do so was reversible error.

2.—Same—First Application for Continuance—Rule Stated.

In a first application for continuance in the instant case, the real issue which the State was authorized to make in its contest was not the truth of the absent testimony but the diligence to secure the same. Following Steel v. State, 55 Texas Crim. Rep., 556, and other cases. To be diligent it is not required nor expected that the impossibility should be accomplished. And in the instant case diligence to procure the absent witnesses was sufficient. It does not always happen that the absence of a complete diligence would justify the trial court in overruling the motion for new trial. Following Day v. State, 62 Texas Crim. Rep., 452, and other cases.

Appeal from the District Court of Wharton. Tried below before the Honorable M. S. Munson.

Appeal from a conviction of murder; penalty, twenty-five years' imprisonment in the penitentiary.

The opinion states the case.

*Mathis, Teague & Mathis,* and *Wander & Williamson,* for appellant.

*R. H. Hamilton,* Assistant Attorney General, for the State.

MORROW, PRESIDING JUDGE.—Appellant was convicted for the murder of H. C. McCormick; punishment fixed at confinement in the penitentiary for a period of twenty-five years.

The uncontroverted evidence may be thus summarized: Washington Giles, husband of appellant, was charged by the Justice Court with a misdemeanor growing out of the mistreatment of a dog. Giles was out upon his farm some two miles from the county seat. His family consisted, besides his wife, of his mother, Polly Giles, two adopted children, a boy and girl, aged nine and ten years respectively, and a brother, Osborne Giles.

Pitman, a constable, went in an automobile to the home of appellant, taking with him a warrant, and on his way overtook McCormick, also an officer, who joined him. On arriving on the premises, Washington and Osborne Giles were plowing in the field and continued to plow until they reached the end of the turn-row, when they left their plows in the field and came with their stock to the home.

The transaction took place in the evening before sun-down. Pitman advised Washington Giles of the charge against him and the necessity for his arrest. Giles protested, asserting that he was not guilty of the offense and declined to submit to arrest. During the controversy Giles fled. Pitman drew his pistol and pursued him. Giles took refuge in the house. Pitman requested the appellant, who, at the time, was present, to tell her husband to come out and talk to him. She complied with this request. Giles came to the door, when the officer seized his arm and a struggle ensued, at the termination of which Giles said that he would go on condition that his wife accompany him. Pursuant to this, Giles stepped out upon the gallery and the appellant went in the house to make some preparation for the trip. During her absence Giles again asserted his unwillingness to submit to the arrest. He was then seized by the officer who struck him on the head with a pistol. During the struggle in which McCormick also participated, the appellant came out of the house.

It is an uncontroverted fact that during the conflict Osborne Giles came out of the house with a rifle in his hand and presented it in a threatening manner; that Washington Giles became possessed of Pitman's pistol; that he fired and killed the deceased, McCormick, one shot taking effect. Pitman fled and Giles fired at him. Subsequently, Washington and Osborne Giles fled, taking with them the pistol and the gun. They were pursued and three or four days later were killed, appellant, in the meantime, having been arrested and placed in jail.

Concerning her conduct during the encounter, appellant's testimony and that of Pitman are in sharp conflict. That Pitman goes to show that before the phase of the difficulty in which the fatality occurred, she had taken part in opposition to the officer; that when Washington Giles was fleeing and Pitman was pursuing him with a pistol in his hand, she seized Pitman and endeavored to hold him; that while Pitman was endeavoring to pull Giles out of the house, she interposed in his aid; that during the fatal struggle she aided Giles in forcing the pistol out of the hand of Pitman. Thereafter she said: "Now, you got them;" that this was immediately preceding of the shot which killed the deceased.

Appellant testified that just before the officers arrived she had been fishing on the creek nearby and was just returning when she, on approaching the house, heard her husband whistling a religious tune and at the time saw the two Giles plowing, that she also saw an automobile nearby and the two gentlemen—McCormick and Pitman—whom she did not know at the time; that soon after she saw her husband running, followed by Pitman with a pistol in his hand. She was not aware of the occasion for the trouble and became very much excited and asked Pitman not to kill her husband; that Pitman then told her that he had come to arrest him, and she said that she should try to obtain her husband's consent; that she did ask him to accompany Pitman, and during the conversation her husband came to the door. His

arm was seized by Pitman, and believing that it was about to be broken, she asked Pitman not to break it; that at the same time she urged her husband not to further resist, upon which Giles indicated his willingness to go if the appellant would accompany him. To this she assented, but stated that she would have to make some preparation relative to her wearing apparel, as she had been fishing; that Pitman consented to wait until she could do so, and that while she was changing her clothes, her attention was attracted by a controversy on the outside, and upon rushing to the door she observed Osborne and Washington Giles, Pitman and McCormick "tussling," as she expressed it. She exclaimed: "What is the matter?" and Osborne told her that her husband had been snatched off the gallery and hit on the head with a gun. She heard her husband say: "Go and get my gun and kill him," upon which Osborne Washington extricated himself and she saw blood running down her husband's head and asked the officers not to kill him. At that time, Osborne, whom she described as a boy, appeared with a gun and she said: "Oh, son, don't kill him." Upon the presentation of the gun the officers released Washington Giles and ran, leaving him in possession of the pistol, whereupon he said: "I have got to die for this anyway, and I might as well take someone with me." She insisted that she took no further part than that described by her; that she used no words of encouragement and that she made no effort to aid her husband or his brother, and that her entire words and conduct were directed toward peace and prevention of injury.

She made application for a continuance to secure the testimony of the two children who were members of the family. In the application it was asserted that they were present during the transaction and in a position to hear and see all that was said and done, and by them her version of the affair, as given in her testimony, would be supported and that given by Pitman controverted.

At the time of the trial, the only eyewitnesses were the appellant and Pitman. The admitted principals, Washington and Osborne Giles had been killed, Polly Giles, the mother-in-law of appellant, had become deranged and the two children were absent. These children had become members of the family of appellant and her husband some years preceding the tragedy.

Appellant was indicted on the 18th of November and arrested on the 24th of that month, and on the same day caused a subpoena to be issued for the absent witnesses, directed and sent to Jackson County, where, according to her information, the witnesses were at the time. This subpoena was returned by the sheriff on the 26th day of November, accompanied by a letter stating that the witnesses could be found in the city of Victoria in Victoria County; and on the 29th of November a subpoena was obtained and sent to the sheriff of Victoria County, reaching him on the first of December and returned on the 12th of that month, which was Sunday, the trial being set for the 13th. From

this return, it appeared that the witnesses had gone from Victoria County to North Texas for the purpose of picking cotton. These witnesses were negroes, and it was alleged that it was customary at this season of the year to visit the various counties for the purpose of picking cotton.

The application was the first one and the diligence was contested. In the contest it was asserted that at the time the subpœna was issued to Jackson County, appellant was aware that the witnesses could not be found there; that the same was true with reference to the issuance of subpœna to Victoria County; that as a matter of fact, the location of the witnesses was known to the appellant, but the subpœnas were purposely not issued to their proper addresses. In the contest, it was also contended that the children were not present at the time of the homicide.

No evidence appears to have been heard in support of the allegation that the subpœnas were not issued in good faith or that appellant had purposely caused their issuance to a county in which they would not be found, knowing their true whereabouts, save the affidavit of Mr. Pitman, a State's witness, stating that the witnesses were with Eliza Smith in Kingsville, Kleberg County, and that they had accompanied Eliza Smith from Jackson County to Victoria County and from Victoria County to Kingsville. This affidavit, so far as it purports to the state of facts, supports rather than controverts the position assumed in the application, touching the whereabouts of the children, and the same is true of the information received from the sheriff of Jackson County. He stated in returning the subpœna that from the best information obtainable by him "they were in Victoria, just west of the Depot on the north side of the G. H. & S. A. R. R. on the Beeville Branch. The return of the sheriff of Victoria County indicates that the witnesses had been there, it stating that "they were in North Texas, picking cotton, exact location not known."

In Pitman's affidavit attached to the contest, he states, in substance, that he did not see either of the children at the time of the tragedy. Two other witnesses made affidavits that they went to the house about thirty minutes after the tragedy, and upon arrival saw the body of the deceased lying in the yard and at the same time saw Polly Giles and the two children coming from the back way in the direction of the creek. The application was overruled without further evidence.

On the trial, however, Pitman and the affiants gave, in substance, the same testimony as above mentioned touching the witnesses at the time of the homicide, but no further testimony concerning their whereabouts at the time the subpœnas were issued at the time of the trial.

Considering the negro character, the fact that in the night-time the old negress Polly Giles and the two children were not found alone at the immediate spot where the dead man lay, does not conclusively produce the inference that they were not on the premises at the time he was killed.

Upon the trial, appellant testified that she had written and caused to be written letters of inquiry and had received personal information relative to the whereabouts of the children; and that subpœnas were issued in accord with the information thus obtained; that at the time of the trial she had no specific knowledge of their whereabouts other than that contained in the information adduced in response to the subpœnas.

She also testified that the children were present at the time of the homicide; that one of them came to the house with her and that while she did not see them during the excitement immediately antecedent to the struggle, she saw them immediately afterwards. It is also shown that at the time of the trial, on the information received, that the witnesses were in Kingsville. A subpœna for them was sent to the sheriff there and was returned later not executed.

Testimony was developed upon the trial that the witness Pitman was very bitter against appellant; that he was jailer and while she was in jail, abused her. The sheriff testified, among other things, that he found her sleeping upon an iron cot with nothing but a newspaper upon it; and that in consequence of that and other conditions he took her out of jail to his home.

The application being the first, the real issue which the State was authorized to make in its contest was not the truth of the absent testimony but the diligence to secure the testimony. Sneed v. State, 100 S. W. Rep., 922; Steel v. State, 55 Texas Crim. Rep., 556; Branch's Ann. Penal Code, Sec. 321. To be diligent it is not required nor expected that the impossibility should be accomplished. Mapes v. State, 14 Texas Crim. App., 134; Donahoe v. State, 28 Texas Crim. App., 13; and other cases in Branch's Ann. Penal Code, Sec. 318. After receiving information that the witnesses were in North Texas at some unknown point, it was obviously impossible to secure their attendance without a postponement of the trial.

In the case before us, we are impressed with the view that the compliance of the law demanded of the appellant nothing more than was done to secure the attendance of the absent witnesses. If, as intimated in connection with the contest, the relatives of the absent witnesses were seeking to avoid the service of process upon them, the appellant's difficulty in securing them may have been increased, but the justice of postponement of the trial for a reasonable time to enable her to overcome the difficulty is emphasized rather than diminished in the absence of evidence connecting her with the effort to avoid their attendance.

It may be possible that those in charge of the absent children may have been frightened at the prospect of bringing them to the county by memory of the fact (which is disclosed by the record) that in consequence of the tragedy, both the husband and brother-in-law of the appellant, who were connected with the homicide, had been killed and her two nephews, who were not shown to have been connected with it, were

hanged. Whatever may have been the reason for the failure of service of process, we find nothing that would warrant the conclusion that appellant's efforts to secure their attendance were not made in good faith and diligently pursued. Even if the matter of diligence were questionable, the absent testimony being to support the defensive theory of the appellant, which otherwise rested upon her testimony alone, was such as the law regards with favor. Koller v. State, 36 Texas Crim. Rep., 499; Beard v. State, 55 Texas Crim. Rep., 158; Branch's Ann. Penal Code, Sec. 329 and cases cited. It being of such character, it does not always happen that the absence of complete diligence would justify the trial court in overruling the motion for new trial. Mitchell v. State, 36 Texas Crim. Rep., 278; Duffy v. State, 67 S. W. Rep., 420; Day v. State, 62 Texas Crim. Rep., 452; Branch's Ann. Penal Code, Sec. 319.

Appellant's conviction rests upon the theory that she was a principal actor in the homicide. Assuming that the conflict arose and proceeded, as the State's witnesses described it, her presence was accounted for in a manner consistent with her innocence. The State's testimony suggests that the intention to kill the deceased was not formed in the mind of Washington Giles until after, under appellant's persuasion, he had agreed to submit to the arrest and the appellant had agreed to accompany him. From the State's standpoint, it appears that the appellant was not present when Washington Giles indicated that he had changed his mind about submitting to arrest, she being at that time in the house making preparation for the trip.

From Pitman's testimony the following quotation is taken:

"There was nothing done by either of them until after I jerked Washington Giles off the gallery and hit him in the head with the pistol and then the boy (meaning Osborne Giles) came out of the house with a rifle. After I jerked Washington Giles off the gallery and hit him with the pistol then she (appellant) came out of the house."

Taking into account the manner of making the arrest, and recalling that appellant was the wife of Washington Giles and that on coming out of the house she beheld him wounded and bleeding in the struggle with his assailant, some participation in the conflict by her is accounted for as not necessarily unlawful. Guffee v. State, 8 Texas Crim. App., 187. The State's evidence, revealing that she may not have known the cause of the renewal of the conflict, there being no direct testimony that she heard or was aware of the fact that Washington Giles had recanted his intention to submit to arrest, suggests that she may have joined in the effort to disarm Pitman with no purpose other than a lawful one—that of protecting her husband from further injury. Her testimony, if believed by the jury, would have made it plain that her purpose was lawful. The testimony of the absent witnesses, according to the application, would have supplemented that of appellant upon this phase of the case.

Considering the character of the diligence use and the materiality of the absent testimony as developed upon the trial, we believe that in refusing a new trial the learned trial judge fell into error. For this reason a reversal of the judgment is ordered.

*Reversed and remanded.*